THE PEOPLE OF THE STATE OF NEW YORK ex rel. MANLIUS SCHOOL, Relator, against IRVING C. ADAMS and Others, Assessors, Respondents.

Supreme Court, Onondaga County, June 14, 1930.

Hancock, Dorr, Kingsley & Shove, for the relator.

Estabrook, Estabrook & Harding, for the respondents.

CHENEY, J. The relator in these cases, feeling aggrieved at certain assessments levied against its property for the years 1926 and 1927, presented its petition in each of those years to the Supreme Court, as provided by section 291 of the Tax Law, setting forth that such assessments were illegal. The Supreme Court thereupon allowed writs of certiorari to review such assessments. Upon the return of such writs, respectively, it appearing to the court that testimony was necessary for the proper disposition of the matter, the court appointed a referee to take such evidence and report the same to the court with his findings of fact and conclusions of law. The same referee was appointed in both proceedings, and they were tried together. The referee heard the evidence and has reported the same to the court, with his findings of fact and conclusions of law, and the whole matter is now before the court upon a motion for confirmation and for final order in the proceedings.

This is a statutory proceeding, and while the testimony was taken before a referee and he has reported the same with his conclusions of law and fact, the final determination whether the assessment is erroneous or not " rests not with the referee but with the court at Special Term, to which he reports the testimony and his conclusions, which in the language of the statute constitute only ' a part ' of the matter upon which the court is to base its determination." (People ex rel. Jamaica Water Supply Co. v. State Board Tax Comrs., 196 N. Y. 39, 50.)

The ground of the illegality of the assessment claimed by the relator is that the property which is the subject of the assessment is exempt from taxation by virtue of section 4 of the Tax Law. Subdivision 7 of the section, by virtue of the 1927 amendment (Laws

of 1927, chap. 565) ▮ reads as follows: " The real property of a corporation or association organized exclusively for the moral or mental improvement of men or women, or for religious, bible, tract, charitable, benevolent, missionary, hospital, infirmary, educational, scientific, literary, bar association, library, patriotic, historical or cemetery purposes, or. for the enforcement of laws relating to children or animals, or for two or more such purposes, and used exclusively for carrying out thereupon one or more of such purposes, and the personal property of any such corporation shall be exempt from taxation. But no such corporation or association shall be entitled to any such exemption if any officer, member or employee thereof shall receive or may be lawfully entitled to receive any pecuniary profit from the operations thereof, except reasonable compensation for services in effecting one or more of such purposes, or as proper beneficiaries of its strictly charitable purposes; or if the organization thereof for any such avowed purposes be a guise or pretense for directly or indirectly making any other pecuniary profit for such corporation or association, or for any of its members or employees, or if it be not in good faith organized or conducted exclusively for one or more of such purposes."

The proof of the relator shows that it was incorporated in 1881 under the name of St. John's Military School as an educational corporation for the purpose of the education of boys so as to fit them for colleges and universities and for the pursuits of life and the formation of their characters on the principles of Christian morality and Christian religion. Since its incorporation the name of the corporation has been regularly changed to " Manlius School." The relator took over from the purchaser the property of a former school which had been unsuccessfully operated and which had lost its property by mortgage foreclosure. Upon this property the relator opened and conducted a school for the education of boys along the lines above stated. This school was conducted by the relator until 1888, but apparently it was not any more successful than its predecessor, and at the close of that school year there were only eight boys as a nucleus for the school for the next year.

In January of that year the board of trustees of the corporation executed a lease of the plant in which they had theretofore operated the school to William Verbeck, at an annual rental of $3,000, the term to begin at the end of the scholastic year, and the corporation then ceased to operate the school, and did not resume its operation until 1923, as will be hereafter noted. Verbeck took over what was left and conducted from that time on a private school,

using, however, the same name. He supplied or procured all the funds necessary for its operation and gradually by his ability and energy built up the school until in 1923 it had about 350 students in attendance. The rent under the lease was paid and the lease was renewed from time to time until 1918, in which year a lease of the property was executed between the corporation and William Verbeck for a term of fifty years at an annual rental of $2,000.

At the time the first lease was entered into, the property of the corporation consisted of a tract of twenty-two and one-half acres upon which were erected three buildings, an administration building, a gymnasium and a stable. While the school was being operated by William Verbeck, many changes were made in the buildings upon this property. Several times certain of the buildings were destroyed by fire, and they were rebuilt, the stable was converted into a dormitory, and additional buildings were added. All of this building was financed by William Verbeck individually, with the exception that the trustees of the corporation contributed the sum of $2,500 from the accumulated rents to assist in converting the stable into a dormitory, and the insurance money, $23,000, for the purposes of rebuilding the administration building destroyed by fire, and certain contributions were made by old alumni of the school and their parents towards some of the construction amounting to $6,125. All of the other funds were raised by William Verbeck, and his personal contributions towards the cost of the new buildings erected upon the leased property, the property of the corporation, amounted to $47,200, practically all of which came from the profits of the operation of the school, the surplus of the receipts over the expense of operation.

As the school increased in numbers it was evident that there must be an increase in its facilities. Verbeck purchased from time to time additional land, taking the title in his name individually. Some of this land was on the other side of the main highway, opposite the original tract of the corporation, and some of it on the same side of the road both to the north and the south of the corporation land. All of this land was used for the purposes of the school conducted by Verbeck, and upon that part of the other side of the road were erected a number of new buildings. The acquisition of all this land and the erection of these buildings was financed entirely by Verbeck, with the exception of contributions amounting to $30,000 which he received, and the sum of $25,000 which he procured from one of his friends, which indebtedness was voluntarily afterward canceled. The school which he had conducted had been successful and there had been during most of the time an excess of receipts

over the operating expenses, and that excess was used by Verbeck in these building operations.

In 1917 Verbeck became financially embarrassed and was adjudicated a bankrupt, and a trustee in bankruptcy was appointed. The trustee in bankruptcy managed the financial affairs of the school while it was in his charge and reported a substantial excess of receipts over operating expenses. In closing up his affairs he deeded the real property and the personal property used in the conduct of the school and the good will of the business which passed to him as trustee in bankruptcy to William J. Bourke. Later William J. Bourke conveyed the same property which he obtained from the trustee in bankruptcy and another piece of property to William Verbeck. The evidence does not disclose whether the amount realized by the trustee was or was not sufficient to pay the debts proven in the bankruptcy, but we are not concerned with that inquiry. In any event the legal title passed by those transfers back to Verbeck.

In 1919 a corporation was formed under the name of the " William Verbeck Corporation " and August twenty-seventh in that year Verbeck conveyed all the real estate to which he had obtained title from Bourke, and another piece of land in the vicinity to which he also had title, and all the equipment used in the operation of the school and the fifty-year lease of the property of the St. John's Military School Corporation to that corporation, and from that time on the school was conducted by the William Verbeck Corporation.

This corporation was authorized to issue both preferred and common stock. There was issued $32,200 par value of preferred stock to certain alumni and friends for cash paid into the corporation, and $290,000 par value to Verbeck in exchange for the property which he conveyed to it. After the acquisition of this property by the corporation, another building was erected on a part of the real estate acquired from Verbeck at a cost of $107,000, which was paid in part from the proceeds of a loan made by the corporation and the balance from the treasury of the corporation.

It became evident, in order to provide for the replacement of the buildings and equipment of the institution and the furnishing of such additional facilities as the growing needs of the school required, that an appeal would be necessary to the alumini and others charitably inclined for donations for such purposes, and that in order to make a successful appeal to that effect, a change should be made in its financial setup, that the property be all conveyed to the St. John's Military School Corporation, a purely educational corporation, and that the school thereafter should be conducted by that corporation, and the William Verbeck Corporation with its possibility of individual profit eliminated.

In order to carry that plan into effect, as of the 2d day of July, 1923, the William Verbeck Corporation conveyed all its property to St. John's Military School Corporation, and received in exchange therefor $322,200 of bonds secured by a trust mortgage upon the premises so conveyed; $32,200 of those bonds were distributed by the William Verbeck Corporation to its preferred stockholders in exchange for their stock, and $290,000 was distributed presumptively to William Verbeck in exchange for his common stock in an equal amount, and it is assumed, in the absence of any proof, that the William Verbeck Corporation was wound up and dissolved. Actually none of those bonds were issued to William Verbeck, but they were distributed to his nominees as follows: Katherine J. Verbeck, his wife, $150,000; Guido Verbeck, a son, $80,000; Karl Verbeck, a son, $10,000; William J. Verbeck, a son, $10,000; Perrin J. Babcock, $15,000, and Stone, Seymour & Co., $25,000 — all of whom at the time of the hearing herein were the holders of those bonds in those amounts.

It is conceded in this case that the William Verbeck Corporation, at the time of this transfer, was the owner of property which was fairly worth, upon disinterested appraisal, lands, buildings and personalty, $431,583.26, and that its liabilities exclusive of its capital stock were $93,854.26, leaving a net worth of $337,729, and that all the property was transferred to and has been enjoyed by the relator corporation since that time; and that the school has been operated by the relator corporation since that time; and that all the excess of receipts over operating expenses have been retained by the corporation since that time and used in the reduction of its indebtedness and the purchase of additional equipment and facilities for the conduct of the school conducted by it.

The testimony is that contemporaneously with the issuance of the bonds, although the written instrument was not executed until the 30th day of November, 1926, an agreement was made by each of the various persons to whom were issued the $290,000 of bonds in exchange for the common stock, with the relator corporation and William Verbeck, to the effect that although such bonds on their face provided for interest at five per cent, (a) " that neither he nor any subsequent holder of all or any of said bonds so to be issued to him will at any time demand in any way payment of any interest on all or any of the said bonds so to be issued to him, unless and until and only during such period or periods of time as a majority of the board of directors of the party of the first part [St. John's Military School] shall in their absolute judgment determine that taking into consideration all expense of operating the school, the necessity of maintaining their properties, providing

for replacements and additions, and for adequate endowment for general corporate purposes, interest on the above mentioned bonds can be paid without in any manner curtailing the activities of, or the proper exercise of the corporate purposes, of the party of the first part, and (b) that because of such non-payment of interest, neither he nor any subsequent holder of any or all of said bonds will in any manner claim that there has been a default under the terms of said bonds or under the mortgage to be given to secure the same, or take any steps or proceedings to enforce payment of said bonds or of said interest thereon, consequent upon the happening of a default in the payment of interest on said bonds." It appears that each of the bonds issued in exchange for the common stock of the William Verbeck Corporation bears upon its face a stamp or indorsement to the effect that such bond was issued and is subject to the terms of such agreement. It further appears that no interest has ever been paid upon any of said bonds since they were issued, nor has any such interest been accrued as a liability upon the books of the corporation.

It also appears that though in form a membership corporation, the corporation has no members aside from the individuals composing the board of directors or trustees, and is a self-perpetuating body, the vacancies in the board being filled by election by the remaining members; that at the time of the transfer in 1923, among others William Verbeck, Guido F. Verbeck, Walter R. Stone and Perrin L. Babcock were trustees of the corporation and officers thereof, and were at the time of the commencement of this proceeding; and that at that time William Verbeck, Guido F. Verbeck, Karl Verbeck, Walter R. Stone and Perrin L. Babcock were employees of the relator corporation and were receiving certain compensation for the services performed by them in carrying out the purposes of the corporation and the conduct of the school so operated by it; and it is conceded by the respondents that such compensation so received is no more than a reasonable compensation for the services so rendered by them respectively.

It thus appears that the relator is a corporation organized exclusively for educational purposes and that its property concerned in this proceeding, with the exception of two pieces of real estate, which it is conceded are taxable, is used exclusively for carrying out thereupon its educational purposes, and by virtue of the statute (Tax Law, § 4, subd. 7) is exempt from taxation thereon, unless the court shall hold that some officer, member or employee may be lawfully entitled to receive any pecuniary profit from the operation thereof, or that the organization thereof for such avowed educational

purpose be a guise or pretense for directly or indirectly making any other pecuniary profit for any of its members or employees, or if it be not in good faith organized or conducted exclusively for such educational purpose.

It is conceded in the briefs filed by both parties that the question of whether or not the relator is entitled to an exemption must be determined upon the facts, circumstances and conditions as they existed at the time of making the assessments, and that seems to be supported by the authorities. (*Matter of Mary Immaculate School of Eagle Park*, 188 App. Div. 5; *Amherst College* v. *Assessors of Amherst*, 193 Mass. 168.) It appears without question that at the time the assessments in question were made no officer, member or employee of the relator was receiving and had not received any pecuniary profit from the operations thereof except reasonable compensation for services in effecting its educational purpose, nor in view of the agreement waiving interest on the bonds, were they lawfully entitled to receive any such pecuniary profits. Therefore, the first exception does not apply to withdraw the exemption.

The other exception is whether the organization of the relator for an avowed educational purpose be a guise or pretense for directly or indirectly making any other pecuniary profit for such corporation or for any of its members or employees or if it be not in good faith organized and conducted exclusively for such educational purpose. This question can be treated from two different viewpoints; one has reference to the payment of the principal of the bonds held by certain members or employees, and the other by reason of the possible payment in the future of interest thereon, which may possibly be paid out of profits, if such term be construed to mean an excess of receipts over operating expenses.

In considering the first of these viewpoints, we must confine our attention to what took place at the time of the so-called reorganization of 1923, for there can be no question but that the original organization of the corporation in 1881 was free from any such vice. The transaction of 1923 narrows down to this: The corporation then purchased certain property which it did not own and which it needed for the carrying out of its educational purpose; that it did not pay therefor in cash, but in lieu thereof issued its bonds or promise to pay in an amount which was less than the fair market price thereof and in addition obtained the cancellation of a lease of all its other real estate, which prevented it from carrying on the school. We can see no distinction in the case whether the purchase was made by cash or by bonds secured by a mortgage, even if some of the bonds afterwards came into the hands of members or employees of the corporation. (*Borough of Princeton* v. *State*

*Board of Taxes & Assessments*, 96 N. J. Law, 334; 115 Atl. 342.) The respondents claim that the vice of this transaction lies in the fact that this property so purchased was paid for, for the most part, out of the profits of the school while it was being conducted by William Verbeck and the William Verbeck Corporation, and that these present employees of the relator, if these bonds are eventually paid or if they dispose of them, will be then deriving a profit from the conduct of the school. Such a conclusion is not justified by the facts. The relator corporation had conducted a school upon its property up to 1888 and had not made a success of it. In that year it leased the property to William Verbeck and discontinued the personal conduct of the school. That lease was successively renewed and a lease of the property was outstanding at the time of the transaction. It may be that the lease contained a requirement that a school of the character which the relator was authorized to conduct be maintained upon the demised premises during the continuance of the lease. The only lease which is in evidence is the last one, the one which was in existence at the time the transaction in question was made, and that lease contains such a provision. From the time of the first lease, Verbeck maintained and operated a school on the premises at his own risk and expense. He furnished the funds necessary for its operation and received the proceeds of the school. It was his own private business, and if any profits were made from that business they were his personal property. He conducted the business until his bankruptcy, and as the result of the bankruptcy proceedings what was left of his property came back to him. We have no information as to the *bona fides* of that transaction; only his creditors could object and they apparently were satisfied. Then the William Verbeck Corporation was formed and to that corporation William Verbeck conveyed all the property, real and personal, used in the management of the school, and the corporation issued to him common stock of the corporation in an amount which does not seem from the evidence to be more than the fair value of the property conveyed. But we are not concerned here in that inquiry. No one can question it except the stockholders, the existing creditors, and perhaps the future creditors of the William Verbeck Corporation. It is not an issue in this proceeding. Thereafter the William Verbeck Corporation conducted the school until the transaction in question as a private corporate enterprise, and if any profits resulted they belonged to the corporation.

The attention of the court has not been called to any case which holds that there was anything illegal in the conduct of the relator in so leasing its property to a third person and permitting such third person to make a profit from the business conducted thereon. On

the contrary, that precise situation appeared in the case of *People ex rel. Board of Trustees of Mt. Pleasant Academy* v. *Mezger* (98 App. Div. 237), where the fact that the plant was leased to others for the purpose of conducting the school did not affect the question of the exemption of its property from taxation, provided the rents received were expended by the corporation in improving the school buildings and grounds.

The learned referee, after finding the facts in detail, made these findings:

" 46. The reorganization of the Board of Trustees of the Relator and change in the Board of Trustees and transfer of property hereinbefore mentioned from the William Verbeck Corporation to the Relator and the issuance of the bonds in the par value of $290,000 to William Verbeck, and the distribution thereof by him and the contract dated July 21, 1923, relating to the deferring of payments of interest provide for and resulted in a pecuniary profit from the operation of the Relator to William Verbeck and his family, other than reasonable compensation for services rendered by them." And

" 47. That the arrangements specified in the last foregoing findings of fact and the present organization of the relator was a guise or pretense for directly or indirectly making a pecuniary profit for the relator's employees, William Verbeck, Guido Verbeck, Karl Verbeck and Verbeck's wife."

I am unable to follow the referee in his conclusions as so found and consequently must refuse to find those facts, as I have arrived at the opposite conclusion.

It, therefore, follows that the property of the relator is exempt from taxation and that the assessments of the real property of the relator except parcels Nos. 9 and 10 in 1926 and the assessments of 1927 except parcel No. 10, were illegal and erroneous and should be set aside, and the taxes paid upon such illegal and erroneous assessments should be refunded to the relator. Findings may be prepared in accordance with this memorandum. If not agreed upon, they may be settled on two days' notice.