THE PEOPLE OF THE STATE OF NEW YORK ex rel. PROVIDENT LOAN SOCIETY OF NEW YORK, Relator, against HARRY B. CHAMBERS et al., Constituting the Tax Commission of the City of New York, Respondents.

Supreme Court, Special Term, New York County, March 17, 1949.

*Pliny W. Williamson, John E. Walker* and *Thomas J. Whalen* for relator.

*John P. McGrath, Corporation Counsel* (*Morris Handel* and *William F. Murphy* of counsel), for respondents.

Schreiber, J. In this tax certiorari proceeding, in which all the facts have been stipulated in lieu of a trial of the issues, the Provident Loan Society of New York (hereinafter referred to as the " relator " or the " Society ") seeks a final order adjudging that it is a corporation organized exclusively for charitable purposes and devoted solely to the carrying out of those purposes, and that the real property occupied as its principal office is therefore exempt from taxation for the year 1948–1949. By agreement of the parties, the determination made in thirteen similar proceedings affecting the other parcels of property owned by the relator in the city of New York is to be governed by the result of this proceeding.

The application for exemption is made under subdivision 6 of section 4 of the Tax Law, which exempts from taxation " the real property of a corporation or association organized exclusively for * * * charitable, benevolent * * * purposes * * * and used exclusively for carrying out thereupon one or more of such purposes " provided that " no such corporation or association shall be entitled to any such exemption if any officer, member, or employee thereof shall receive or may be lawfully entitled to receive any pecuniary profit from the opera-

tions thereof, except reasonable compensation for services in effecting one or more of such purposes.''

The respondents, constituting the tax commission of the city of New York, contend that relator was not organized exclusively for charitable purposes, that its real property has not been devoted exclusively to such purposes, and that there is a possibility of pecuniary profit which, in any event, requires the denial of relator's claim to exemption.

Relator was incorporated on April 13, 1894, by special act of the Legislature (L. 1894, ch. 295). For some years prior thereto persons engaged in charity work had recognized the existence of a public need for an organization which would lend money to those who needed it at low rates upon good security and thus save them from the high rates of interest exacted by pawnbrokers and loan sharks and from their sharp practices. In *The Charities Review* of March, 1892 (published by Charity Organization Society), there appeared an article by Alfred Bishop Mason from which the following is an excerpt: '' there is still one gap in our line of defences against misery which needs to be filled. We should unite as pawnbrokers; lend money at low rates on good security to approved borrowers among the poor; and so divorce the three golden balls from The Three Furies. There is no merchant in this community who would not be driven into bankruptcy if his unsecured bills payable bore the rate of interest which the very poor have to pay on most undoubted security. * * * The necessaries of life should be cheap. Borrowing is often the greatest of necessities for the worthy poor. They pay for it the price of the greatest of luxuries. Let the Anglo-Saxons learn from the Latins and build up in New York a great Mont-de-Piete, where it shall not be shame and ruin to borrow and where self-respect need not make part of every pledge.''

On May 9, 1892, a special committee of the Charity Organization Society, in a report to that society's executive committee, recommended the formation of a corporation '' to lend money at reasonable rates upon pledges of personal property with a view to correcting the evils then attached to the pawnbrokerage business, and thereby improving the condition of the poor.'' The report contemplated '' that the operations of the Company will be conducted on the principle of charging as low a rate of interest as may be found compatible with entire safety and the necessary development of the business, in order that the main end in view may always be the greatest practicable benefit to the

borrowing class." In 1893 a severe panic swept the country, the full effects of which were just being felt in 1894. Ready money became exceedingly scarce. Banks withheld payments to depositors. Money in small denominations was dealt in at a premium on Wall Street. Bankruptcies and unemployment existed on a large scale. In New York City thousands of persons and families, formerly self-supporting, found themselves without income or means, and the Mayor appointed a special committee to help those in need. The lack of money was especially great in the case of ordinary individuals. The institutions now engaged in serving the small borrower — such as the licensed lender, the industrial banks, the credit unions, and the personal loan departments of commercial banks — had not yet come into existence. The only ones who made small loans were the pawnbrokers and the loan sharks. Pawnbrokers were authorized (L. 1883, ch. 339, § 7) to charge 3% per month for the first six months on loans under $100 secured by a pledge of tangible personalty. Many pawnbrokers made no loans for more than six months. Loan sharks charged interest rates amounting to from 60% to 1000% on assignments of wages and on chattel mortgages, the majority of such loans being for less than $50 each. As debts were created by the making of such loans, borrowers were soon submerged. " Social distress and increased dependency upon the public and philanthropic agencies followed in the wake of the loan-shark business." (N. Y. Legis. Doc., 1941, No. 45, p. 8.)

To combat these conditions, a bill in accordance with the recommendations of the special committee of the Charity Organization Society, previously referred to, was prepared by that society and introduced in the Legislature. It provided for the incorporation of the Provident Loan Society of New York. To acquaint the public with the origin and purpose of the proposed Society, an article on the subject was published by the Charity Organization Society of New York in the March, 1894, issue of *The Charities Review*. It stressed the existence of large numbers of people who were temporarily ill or unemployed and in need of assistance " without being willing to accept charity " in the sense of alms. Such persons, the article pointed out, would be substantially helped and made happy if they could secure funds, by temporary pledges of household ornaments or other articles, which they could repay later on and thus be saved from hurried sales of their possessions at sacrifice prices. The article referred to the high rates of interest and the onerous terms extorted by pawnbrokers and pointed out that to counteract the influence of

pawnbrokers, institutions to assist poor people in temporary need by making small loans at reasonable rates on pledges of personalty had been in existence in Europe for many centuries. These institutions, originally called " Mont-de-Piètè ", were started in Rome and the Papal Dominions by Pope Sixtus V (1521–1590). They fixed a rate of interest just high enough to cover the expenses connected with the keeping of the pledges and the regular running expenses, including a moderate return on the required capital. Reference was made in the article to the fact that according to Webster's Unabridged Dictionary the name " Mont-de-Piètè " was one originally given to all charitable institutions, and later on, in Italy particularly, to the public pawnshops. The article concluded with a recapitulation of the advantages which " such a *charitable* institution would have for the deserving poor in New York City " (italics supplied), viz.:

" First: The Society would advance as near to the real value of the object pledged as safely possible. Second: While pawnbrokers charge at least the regular rate of interest, viz.: 30 per cent. per annum, and sometimes more, this Society probably need not charge more than 12 per cent. per annum; and as these transactions would grow in the course of years, a lesser charge might cover the running expenses, and the rate of interest could therefore be reduced. Third: While pawnbrokers, as is well known, are very rigid about getting what is due them at the proper time, without, as a rule, giving any grace, the Society could give six to twelve months' time, after the loan matured, to redeem the pledge. Fourth: The Society would facilitate repayment of the amounts lent, by allowing the borrower to repay in instalments. Fifth: The borrower, if the article pledged by him had to be sold, after the time of grace had expired, would have the guaranty of a fair public sale at auction, and would receive back any amount that the sale of the article pledged would realize over the amount due and expenses of sale."

While the bill for the incorporation of the relator was pending in the Legislature, various objections were interposed. An answer to those objections was issued by the executive committee of the Charity Organization Society, one of whose members was Rev. David H. Greer, later Bishop Greer. The answer stated that " The incorporators of the Society, who are almost without exception actively connected with the Charities of New York, either as members of the Mayor's Relief Committee, called into existence by the unusual distress of the past winter, or with old-established benevolent societies of New York of every creed and nationality, supposed that the bill would explain itself as a

*charitable and benevolent enterprise,* more particularly as it has the universal approval of the public press '' (italics supplied). One of the objections had been that the bill did not limit the rates which the Society could charge to half the full rate charged by pawnbrokers, or less, '' as intended ''. The committee's answer was: '' This limitation was expressed in the bill as originally drafted, but was stricken out because it might make the bill unconstitutional as violating that article of the Constitution which prohibits any private act ' regulating the rate of interest.' The Society can and will limit the rate of interest by its by-laws. At the most the Legislature is giving to well-known citizens no greater power as to interest than any pawnbroker in New York already possesses.'' Another objection was that '' The franchise given by the bill is of ' great value ' and can be made a source of profit.'' This was answered as follows: '' It can have no value except to the poor, because every member and trustee of the Society is positively prohibited from receiving any compensation for his services or profit above lawful interest on money loaned to it. The only possible resources of the Society are gifts and loans. The givers can receive nothing back, the lenders only legal interest.'' The objection that '' While the intentions of the present corporators cannot be questioned, their successors may use the Society for gain '' was answered by pointing out that '' The provisions of the act just mentioned have been expressly framed to prevent such a possibility and accomplish their purpose.''

The '' purpose '' of the society, as stated in section 1 of the special act incorporating it, was ''aiding such persons as said Society shall deem in need of pecuniary assistance, by loans of money at interest, upon the pledge or mortgage of personal property.'' To guard against the possibility of private profit, section 2 of the act provided that '' no member or trustee of the society shall receive any compensation for his services, or any profit other than lawful interest on money loaned to it.'' The act authorized the adoption of a constitution providing, *inter alia,* for the management of the property and regulation of the affairs of the society. Such a constitution was adopted. Article XII provided and still provides that '' The Society shall not charge or receive any interest on loans at a greater rate than one per cent. per month or fraction thereof '', thus carrying out the promise of the executive committee of the Charity Organization Society that '' the Society * * * will limit the rate of interest by its by-laws.'' In addition, article XI of the constitution

read and still reads as follows: "Distribution of Property or Surplus. No member of the Society shall have the right to share in the distribution of any property belonging to the Society, however acquired, *by reason of membership*. If the Society shall be dissolved, or its existence terminated in any way, each holder of any certificate of contribution shall be entitled by virtue thereof to receive back the contribution evidenced by such certificate, with interest thereon at six per cent. from the last date at which interest was paid, and no more. Any surplus remaining after providing for this repayment shall be distributed among such charitable organizations, whether certificate-holders or not, which are located in the City of New York and conduct their operations chiefly within that city, as the then Trustees shall determine. The Trustees may from time to time make distributions to such charitable organizations out of surplus earnings as they may deem expedient." (Italics supplied.)

The incorporators of the society consisted of a group of leading public-spirited citizens of New York, among them Otto T. Bannard, Henry R. Beekman, Frederic R. Coudert, Robert W. de Forest, Abraham S. Hewitt, Seth Low, Jacob H. Schiff and Bishop Greer.

With this background we may now consider whether relator was "organized exclusively for * * * charitable * * * purposes", as required by subdivision 6 of section 4 of the Tax Law. Respondents argue that the purpose for which relator was formed must be determined solely from the statute under which it was incorporated because it is only "when the act of incorporation is silent" that resort may also be had to the corporate "constitution and by-laws" (*People ex rel. Untermyer* v. *McGregor*, 295 N. Y. 237, 244). According to respondents, relator was incorporated for the sole purpose of lending money at interest upon pledges of personal property and its act of incorporation, far from being silent as to its purpose, very clearly states its sole purpose to be the lending of money at interest. "Organization for the purpose of conducting the business of a 'pawnbroker'", say respondents, "is not a 'charitable' purpose within the meaning of the Tax Law."

Even if the purpose for which relator was organized must be determined solely from the provisions of the act of its incorporation, without resort to its constitution, it seems to be clear that relator's purpose was charitable in nature. The purpose is expressly declared in the act itself as the "*aiding [of] such persons as said society shall deem in need of pecuniary assistance,* by loans of money at interest, upon the pledge or mortgage

of personal property.'' (Italics supplied.)  The expressed object
and purpose of the Society is not, as respondents urge, to lend
money at interest, but rather to aid those needing financial
assistance.  The lending of money at interest is merely the means
adopted to achieve the end desired, viz., the rendering of financial
aid.  That the lending of money to those in need of it was not
to result in private profit or gain, was expressly provided for
in the act of incorporation — '' No member or trustee of the
society shall receive any compensation for his services, or any
profit other than lawful interest on money loaned to it.''  Only
because the State Constitution prohibited a private act '' regu-
lating the rate of interest '' did the act of incorporation omit a
provision, *which was in the bill as originally drafted,* limiting
the rate of interest which could be charged to half, or less, the
amount of full pawnbrokers' rates.  Such a limitation was,
however, immediately placed in the constitution adopted upon
the incorporation of the Society and it has remained there ever
since.  The charter of the Society is a statute.  In construing
the statute, the court may consider its legislative history as well
as the conditions existing at the time, the evils sought to be
corrected and the purposes to be accomplished.  Read in the
light of its history and the conditions which brought it about
and which it was intended to alleviate, it is difficult indeed to
accept the view that the purpose of the act incorporating relator
was merely to enable the latter to engage in the business of a
'' pawnbroker ''.  Surely, the mere omission from the act of
incorporation of a restriction upon the amount of interest which
could be charged should not, in view of the constitutional reason
for the omission and the immediate adoption of a provision in the
Society's constitution containing such a restriction, require a
holding that the relator was not organized for a charitable
purpose.

Respondents urge that the fact that relator's purpose as
expressed in the act of its incorporation is to aid persons deemed
to need pecuniary assistance does not support its claim that it
was organized for a charitable purpose, because a later act of the
Legislature (L. 1895, ch. 326) used the same language in provid-
ing for the incorporation of ordinary pawnbrokers.  Although
the argument is not entirely without force, the charitable char-
acter of relator's purpose to give '' aid '' without profit to per-
sons '' in need of pecuniary assistance '' cannot be overcome
or negatived by the fact that a subsequent Legislature used
similar language in a situation where no charitable purpose was
involved.  Certainly it may not be successfully maintained that

aiding persons requiring pecuniary assistance without private profit is a noncharitable purpose.

Respondents contend that the lending of money at interest cannot be classified as an act of charity because the term " charity " is " commonly and generally applied to some form of almsgiving to the poor." Relator concedes that no decision precisely in point has been found, claiming, however, that this is due to the fact that no organization similar to relator has been discovered in the United States. It is well settled that activities may be charitable in nature and entitle a corporation or association engaging in them to exemption under subdivision 6 of section 4 of the Tax Law, notwithstanding the fact that the services are not rendered gratuitously or limited exclusively to the poor. In *People ex rel. Doctors Hospital* v. *Sexton* (267 App. Div. 736, affd. 295 N. Y. 553), Mr. Justice Cohn, writing for the Appellate Division, said (p. 741) : " Moreover, the legal meaning of charitable purposes is not necessarily limited to free service to the poor. (*Matter of MacDowell,* 217 N. Y. 454, 463; *Y. M. C. A. of City of New York* v. *City of New York,* 159 Misc. 539, affd. 251 App. Div. 821, affd. 276 N. Y. 619; *Matter of New York University* v. *Taylor,* 251 App. Div. 444, affd. 276 N. Y. 620.)

" Hospitals which are devoted to the care of the sick and injured, which aid in maintaining public health and which make valuable contributions to the advancement of medical science are rightly regarded as benevolent and charitable. A hospital association not conducted for profit which devotes all of its funds exclusively to the maintenance of the institution is a public charity and this is so irrespective of whether patients are required to pay for the services rendered. (*Butterworth* v. *Keeler,* 219 N. Y. 446, 449; *Matter of Mendelsohn,* 262 App. Div. 605, 610; *Jewish Mental Health Soc.* v. *Vil. of Hastings-on-Hudson,* 255 App. Div. 77, affd. 279 N. Y. 764.)" Although this language may have been dictum in view of the fact that the relator in the cited case was a " hospital " and, as such, expressly exempt under subdivision 6 of section 4 of the Tax Law, even if it did not qualify as a corporation organized " exclusively for * * * charitable * * * purposes ", the statements made are amply supported by the authorities cited and others. In *Butterworth* v. *Keeler* (219 N. Y. 446), it was held that a gift for the promotion of education or learning is a gift for charitable uses unless the recipient is maintained for the private profit of its owners. The court, by Cardozo, J., said (p. 449) : " The rule, of course, is different where the school

or other institution is maintained for the profit of its owners. The purpose must be the promotion, not of private profit, but of public learning.  *  *  *  It is not charity to aid a business enterprise. But the fact that fees are charged is not controlling (*Parks* v. *Northwestern University* [218 Ill. 381]; *Matter of Mac-Dowell* [217 N. Y. 454], *supra,* at p. 464). Most of our universities and hospitals would be excluded by such a test, yet universities and hospitals are unquestionably public charities (*Parks* v. *Northwestern University, supra; Schloendorff* v. *Society of the N. Y. Hospital,* 211 N. Y. 125, 127). What controls is not the receipt of income, but its purpose. Income added to the endowment helps to make it possible for the work to go on. It is only when income may be applied to the profit of the founders that business has a beginning and charity an end. The line of division is the same whether the gift is devoted to education or to the relief of the poor, the halt and the blind.'' In *Webster Apartments* v. *City of New York* (118 Misc. 91, affd. 206 App. Div. 749), the plaintiff which claimed that its real property was tax exempt, was a corporation formed to improve the condition of unmarried working women and establish, maintain and conduct apartments for them where they might find comfortable and attractive homes. A testamentary provision included in the certificate of incorporation declared that the apartments should not be conducted for profit, but solely to provide unmarried working women with homes and wholesome food at a small cost to them, and, in deserving cases, without cost to them. The will also commanded the directors to fix rentals for the apartments and prices for the food to be served in the restaurant with the view of carrying out said purpose. Mr. Justice LEHMAN, later Chief Judge of the Court of Appeals, held that the corporation was exempt from taxation notwithstanding the fact that the plaintiff had failed to show that the recipients of its alleged charity were persons in need of assistance and proven objects of charity. He pointed out that it was to be presumed that the working women who would be received in the apartments would in the main be self-supporting women who would not be willing to be the recipients of charity in the ordinary meaning of the term. Although the opinion refers to plaintiff's activities as '' benevolent '', the reasoning is applicable to the instant case, particularly since the holding, as expressed in the first sentence of the opinion, was that '' the plaintiff corporation is organized exclusively for charitable or benevolent purposes.''

The lending of money to those applying for pecuniary assist-

ance upon the security of pledged articles of personalty, at rates less than those charged by other available sources for such loans, and in amounts and on terms not generally procurable from other sources, constitutes the doing of charity where no private gain can result and where the net income merely augments the funds employed in making the loans from time to time. The public need filled by such loans is comparable to that met by educational and hospital activities and the charitable nature of the lending of money without private profit at lower interest rates and on less onerous terms than may be procured elsewhere is not affected by the fact that the lending is not free or exclusively restricted to the poor. Universities and hospitals qualify as public charities though they do not limit their services to the poor. Cases cited by respondents for a contrary doctrine are not in point. The holding in *People ex rel. Bank for Savings* v. *Miller* (84 App. Div. 168) that savings banks are not charitable or benevolent corporations, is clearly distinguishable, for savings banks yield dividends to their members and are not organized for charitable purposes. In *People ex rel. Chamber of Commerce* v. *Mills* (188 Misc. 593, affd. 272 App. Div. 804) one of the purposes of the relator was to promote commerce, and it was therefore properly held that its purposes were not " exclusively " charitable.

Respondents contend that the underlying concept of all tax-exemption statutes is that the exemption is granted in exchange for the assumption of burdens of a public nature which the government itself should discharge. Acceptance of this criterion does not aid respondents. For centuries the functions performed by relator have been assumed by governments in many countries of Western Europe (see article above referred to in March, 1894, issue of *The Charities Review*), and in the absence of an institution such as the present relator the city or State might conceivably be forced to set up a lending agency to meet the need presently filled by relator. Certainly the lending of money to those in need of it on proper security and at moderate rates cannot at this late date be deemed beyond the proper scope of governmental activity (e.g., Home Owners Loan Corporation, Reconstruction Finance Corporation, etc.).

The views so far expressed have been reached notwithstanding the assumption that the relator's purpose must be determined solely from the act of its incorporation, without resort to its constitution. In the court's opinion, however, the authorities do not lay down so strict and inflexible a test. In *Matter of De Peyster* (210 N. Y. 216) the question to be decided was whether

the respondent was organized exclusively for historical purposes, in which case the bequest to it would be subject to the transfer tax, or for educational purposes, in which event the bequest would be exempt. The court held that the act of incorporation provided only for historical purposes, in " clear and unambiguous " language (p. 221) and (p. 222) that " oral testimony should not be received simply to show that a corporation had undertaken work that was *outside of its corporate powers* " (italics supplied). However, where extrinsic evidence is offered, not to show that a corporation assumed to exercise powers which it did not have, but rather to establish the character of the work undertaken pursuant to its powers, the evidence is admissible (*Matter of Moses,* 138 App. Div. 525, cited in *Matter of De Peyster, supra,* p. 219). In *Matter of Moses* (*supra*) the court said (pp. 529–530) : " While it is true that the status of a corporation must be determined by the act of incorporation and not by proof of what it has *assumed to do (Matter of White,* 118 App. Div. 869), yet I think that proof may be received of the character of the work undertaken by that corporation *pursuant to its powers* " (italics supplied). In *People ex rel. Untermyer* v. *McGregor* (*supra*) the certificate of incorporation provided that the purpose of the corporation was to maintain " a public park and gardens " and a " public playground ". In addition, the certificate provided for the use of the land " for horticultural purposes". The Court of Appeals held that the horticultural purpose was subordinate to, and not co-ordinate or equal with, the other purposes. In reaching that conclusion the court, as it expressly stated (p. 244) took " into consideration the exclusive public use to which the executors and trustees, during their interim ownership, and the trustees of the corporation have devoted the property ", referring to the fact that (p. 243) " from the entry of the *cy pres* decree * * * and continuously thereafter, ' Greystone ' has been used as a public park and garden and for no other purpose ". So, in the case at bar, evidence that since its incorporation, almost fifty-five years ago, relator has never charged more than 12% interest per annum, a rate lower than that generally obtainable elsewhere, may properly be considered for the purpose of establishing that the object for which relator was formed was to make loans at less than the rates charged by pawnbrokers and loan sharks. This is all the more so in the light of the adoption by relator, immediately upon its incorporation, of a constitutional prohibition against charging more than

12% per annum. In *Matter of Corporation of Yaddo* (216 App. Div. 1) it was argued that it did not appear from the certificate of incorporation of the petitioner that the latter had been organized *exclusively* for the purposes specified in the Tax Law. The holding was that resort might be had to the petitioner's by-laws which limited (p. 4) " the use of the property to purposes which are statutory ". The court said (p. 5): " If their operations later do not accord therewith, or if the by-laws are changed so as not to comply with the original purposes then exemption will not follow."

We turn now to respondent's contention that even if relator be deemed to have been organized exclusively for a charitable purpose, its real property has not been and is not " used exclusively for carrying out thereupon * * * such purpose ". Respondents point out that relator has operated so profitably, charging interest at the rate of 12% per annum to its borrowers during most of the years of its existence, that it has accumulated an undistributed surplus of approximately $10,500,000 after paying off those who contributed funds, other than gifts, with interest which amounted to approximately $28,000,000 (these contributions will be referred to in a subsequent portion of this opinion). During the period of its existence relator has distributed to charitable organizations only about $429,000. Although the society recognizes that " the figure of $10,-500,000, viewed by itself, seems a tremendous surplus, it points out that the surplus is the result of 20,682,038 loans aggregating, for the 53.6 years of its existence up to December 31, 1947, a total of $1,096,721,803.50. The surplus therefore, amounts to an average net return of less than 1% on the loans made. The declared aim of the Society is to function as nearly as possible at cost. It claims that to protect the principal fund it could " scarcely have figured any more closely ". Approximately $3,000,000 of the $10,500,000 consists of the Society's real estate and equipment. Furthermore, in 1946, relator incurred an operating deficit of $183,738.84 and in 1947 a similar deficit of $169,098.59. These were the latest figures available at the time the factual stipulation was entered into, and they reveal that the relator has of late been losing money rather than making profits. In any event, it is indisputable that to the extent that the charges made by relator exceed the cost of its lending services, the difference does not redound to the private gain of its members or trustees but goes to augment the fund available for employment in the performance of the

Society's lending functions. The important fact is not whether the charges exceed relator's cost, but rather whether relator is continuing to make loans at rates lower than those generally charged by others and in amounts for which others will not generally make them and upon terms not generally available. For the 53.6 years of its existence up to December 31, 1947, relator's loans averaged $53 each. Customarily 70% of its loans are for sums under $50. Over a number of years 40% of its loans were for less than $15 each. In 1940, it made 198,000 loans varying from $1 to $9 each. In 1947 over 63% of the 182,685 loans, totaling $12,868,160 were for under $50 each. Personal loan departments of commercial banks, which also are permitted to charge 1% per month, do not make loans of less than $50, and the majority of them make no loans of less than $100 each. The charges of industrial banks amount to approximately 14% per annum. Such loans may not legally be made without obtaining the personal obligation of the borrower to make repayment (Banking Law, § 292, subd. 3, par. [a]), and they are not ordinarily made on pledges of jewelry and similar personal property, particularly in amounts under $60. A borrower from *relator*, however, is under no obligation to repay the loan or to pay interest. There is no debt, the advance being made solely on the pledge of tangible personalty. No investigation of the borrower is, therefore, necessary and the loan is made instantly upon application. Commercial pawnbrokers are permitted to charge 3% per month for the first six months on loans under $100 and thereafter 2% per month, and, upon loans over $100, 2% per month for the first six months and thereafter 1% per month. Licensed lenders are permitted to charge 2½% per month on the first $100 and 2% per month on the balance up to $300. It is evident from these figures that relator's charges, which have never exceeded 1% per month regardless of the amount of the loan, are less than those charged by others except personal loan departments of commercial banks, which do not, however make loans of less than $50, whereas the great bulk of relator's loans are for less than that amount. No group other than the relator effectively reaches the field of borrowers who need loans of $60 or less and who have no security to offer except tangible personalty. In Nugent on Consumer Credit and Economic Stability the statement is made that (p. 377): " The rate charged by the Provident Loan Society of New York is, for instance, so far as we are aware, lower than that of any other pledge lending agency in the world, and this accounts, in very large part for the tre-

mendous amount of pawnbroking loans in New York City.'' Relator is thus continuing to fill a public need in making loans in amounts and on terms less onerous than those upon which such loans may generally be obtained elsewhere.

Respondents also urge that relator has failed to use its property exclusively for charitable purposes because it has made a considerable number of large individual loans, one as high as $135,000, and because many, if not most, of its borrowers may not be considered objects of charity because all loans are amply secured and 95% of them in dollar amount (75% numerically) are made on pledges of diamonds or other precious stones. Respondents emphasize that the relator '' deems any applicant to be a person in need of pecuniary assistance '' and accepts applications not limited to persons in sheer need without giving preference to borrowers approved by charitable organizations. As to the large individual loans, the record shows that from 1917 through 1947, except for the year 1929, relator's loans of $1,000 or more amounted to only one half of 1% of the loans made, and in 1929 to 61/100 of 1%. From 1942 to 1947, only 474 loans of over $2,000 each, totaling $1,767,514, were made out of 1,681,429 loans aggregating $93,390,132. As of May 31, 1948, the outstanding loans of $3,000 or over were 54 out of a total of 124,649. It is thus abundantly clear that only an insignificant portion of relator's loans have been for large sums. The word ''exclusively '' is not to be given '' ' an interpretation so literal as to prevent an occasional use of the relator's property for some purpose other than one or more of those specified ' '' (*People ex rel. Mizpah Lodge* v. *Burke,* 228 N. Y. 245, 247). At any rate, as has already been pointed out, the legal meaning of charitable purposes is not necessarily limited to free services to the poor (*People ex rel. Doctors Hospital* v. *Sexton,* 267 App. Div. 736, 741, affd. 295 N. Y. 553, *supra*), and the exclusively charitable character of relator's activities is not affected by the fact that some loans made are large in amount or by the fact that many of the borrowers may not be poor people in a strict sense.

Nor is there merit in the contention that because relator has installed cold storage vaults for the storage of fur coats which it accepts as pledges, it is in the business of fur storage. No claim is made that relator accepts furs or other articles for storage except where the furs or articles are pledged with it as security for loans made by it, the storage being merely incidental to the loan, for the purpose of preventing deterioration of the pledge.

Similarly the fact that relator advertises its loan facilities and

solicits borrowers does not alter the exclusively charitable character of its activities, for the advertising and soliciting have as their sole object the extension of relator's lending facilities and functions to the greatest possible number of those members of the public in need of such facilities and functions.

For the reasons indicated, the court finds itself unable to agree with respondents' claim that even if relator was organized exclusively for a charitable purpose it is not entitled to tax exemption because its property is not being exclusively devoted to that purpose.

There remains for consideration respondents' contention that there is a possibility of pecuniary profit which, in any event, requires the denial of relator's claim to exemption. Subdivision 6 of section 4 expressly provides that no corporation or association shall be entitled to exemption " if any officer, member or employee thereof shall receive or may be lawfully entitled to receive any pecuniary profit from the operations thereof, except reasonable compensation for services in effecting one or more of such purposes." The factual stipulation between the parties concedes that "no officer or employee of said The Provident Loan Society of New York receives * * * any pecuniary profit from its operations, except reasonable compensation for services effecting its purposes ". The stipulation also admits that no officer or employee " may lawfully be entitled to receive " any pecuniary profit except reasonable compensation for services, but at the outset of the trial respondents moved to eliminate this concession as a conclusion of law admitted through inadvertence. Such motion, upon which decision was reserved, is granted, with an exception to relator. The rights of the parties are, however, not affected by the granting of the motion, as there is no evidence whatsoever before the court from which it may be inferred that any officer or employee of the relator " may lawfully be entitled to receive " any pecuniary profit except reasonable compensation for services. " The question of whether or not the relator is entitled to an exemption must be determined upon the facts, circumstances and conditions as they existed at the time of making the assessments * * * (*Matter of Mary Immaculate School,* 188 App. Div. 5; *Amherst College* v. *Assessors of Amherst,* 193 Mass. 168)." (*People ex rel. Manlius School* v. *Adams,* 143 Misc. 459, 466, affd. 232 App. Div. 869, affd. 257 N. Y. 549.) In the *Manlius* case (*supra*) it appeared that at the time of the making of the assessment, no officer, member or employee of the relator was receiving any pecuniary profit

from its operations other than reasonable compensation for services in effecting its educational purpose, and this was held sufficient to entitle the relator to exemption. In *Matter of Mary Immaculate School* (*supra*, pp. 6–7) the court said: "On this appeal it is contended that the relator, being a membership corporation, may possibly allow some official or employee to make a future profit, since it receives pay scholars, and its corporate by-laws have not been produced. It, however, appears without contradiction that no officer, member or employee receives any pecuniary profit from the school operations. It is the use of the property at the time when the tax is assessed which determines whether it is exempt from taxation or not." The court accordingly affirmed the order of Special Term granting the relator's application for exemption.

As to members and trustees of the present relator, it has already been pointed out that the special act incorporating the relator, as well as its constitution, both expressly provide that "no member or trustee of the society shall receive any compensation for his services, or any profit other than lawful interest on money loaned to it." The constitution provided and still provides that the funds of the Society were to be obtained from (1) gifts or bequests (2) contributions made on condition that the contributor would receive a certificate for the amount contributed entitling the holder thereof to such amount, not exceeding lawful interest, as the trustees might determine to pay certificate holders out of earnings, and (3) from loans at a rate of interest not exceeding the lawful rate. As previously pointed out, article XI of the constitution of the Society provides for repayment of contributed funds on dissolution or termination of the Society's existence. Some of the funds acquired by relator for the purpose of making loans upon the security of pledged personal property were obtained by the issuance of such certificates of contribution. These certificates of contribution were issued to those contributing funds in return for the certificates, whether members or non-members of relator. Since the certificates were issued to non-members as well as members of relator, and since the amounts payable on the certificates could not exceed the return of principal with interest at the legal rate, the relationship established by the certificates was essentially one of debtor and creditor. From 1896 to 1942, interest was paid on the certificates at the rate of 6% per annum. In 1943, 4½% was paid, and for the first half of 1944 2½%. As of January 28, 1944, the total amount of the certificates held by *members* was $662,100. On September 30,

1944, all outstanding certificates of contribution were called for repayment. Since 1944, no moneys have been loaned to the Society by any member thereof. It is unnecessary to decide whether, if certificates of contribution were still outstanding, entitling their holders to payments in the nature of interest, this circumstance would forfeit any right of exemption which relator might otherwise possess for, as previously observed, the test is whether *at the time of the assessment,* any officer, member or employee is or may be entitled to any pecuniary profit other than reasonable compensation for services (*People ex rel. Manlius School* v. *Adams, supra; Matter of Mary Immaculate School, supra*). Since September 30, 1944, when the certificates of contribution were called, there have been no holders of certificates of contribution, so that at the time of the assessment involved in this proceeding no officer, member or employee of relator was entitled to any pecuniary profit except reasonable compensation for services. In *People ex rel. Manlius School (supra)*, at the time the assessments were made, the bondholders had waived interest on their bonds. The court said (p. 466): " nor in view of the agreement waiving interest on the bonds, were they lawfully entitled to receive any such pecuniary profits. Therefore, the first exception does not apply to withdraw the exemption."

The case of *People ex rel. Rye C. D. School* v. *Schmidt* (266 N. Y. 196), cited by respondents, is clearly distinguishable. There, on dissolution of the relator, *all* its assets were to be divided among its stockholders. Such assets would include the profits, if any, earned during the period of the relator's operations prior to dissolution. In *Lawrence-Smith School* v. *City of New York* (166 Misc. 856), the new corporation undertook to pay obligations of its predecessor out of the former's profits, notwithstanding the fact that the debts of the predecessor exceeded its assets at the time the new corporation took over. Although the court used language construing the holding in *People ex rel. Rye C. D. School* v. *Schmidt (supra)* as barring exemption if the investment made in the school might be returned on dissolution, the language was only dictum. The fact is that in the *Rye School* case (*supra*) there was not merely a possibility of obtaining a return of the investment but also the possibility of securing on dissolution a share in the profits made prior to that time. It was for this reason that the Court of Appeals declared (p. 198) " The corporate operation of the respondent may lawfully entitle some of its members to receive pecuniary *profit* other than reasonable compensation for services ". (Italics supplied.)

Respondents urge that " practical construction in favor of taxation over a period of more than fifty years requires denial of exemption ". The fact that relator did not apply for exemption until recently is insufficient, in and of itself, to bar it from claiming exemption for future years. It appears that the Society took the position as long ago as 1925 that it felt itself to be exempt, but that it would assume some of the burdens of government as long as it possessed funds not immediately necessary for carrying out its purposes. The position of the Society as to claiming tax exemption seems to have changed as a result of the fact that during the last few years it has been operating at a deficit instead of at a profit, as formerly. It may well be, also, that relator entertained doubts as to the effect of outstanding certificates of contribution upon its right to tax exemption and that it waited to claim such exemption until all certificates had been retired. Obviously the taxing authorities would not grant exemption to relator in the absence of a claim to exemption, and there seems therefore to have been no practical construction by the taxing authorities in the usual sense of the term. At any rate the doctrine of practical construction is to be resorted to only in a doubtful case and not where, as here, relator's right to exemption appears to be clear and free from doubt. In McKinney's Consolidated Laws, (Vol. 1, p. 203), the rule is stated: " A practical construction is of no avail unless the statute is ambiguous, and in no case is a contemporaneous or practical construction controlling; it is merely an aid in the interpretation of doubtful statutes ". In *Matter of City of New York (Willard Parker Hospital)* (217 N. Y. 1), in which practical construction was permitted, the court said (p. 11): " There is a manifest ambiguity in chapter 763 of the Laws of 1857 * * * The statute is not clear and it is proper to consider the contemporary and practical construction of the act by the city and the owners of the property affected ". In *Grimmer* v. *Tenement House Department* (205 N. Y. 549), the court said (p. 550): " There is no question that the practical construction of a statute by those for whom the law was enacted or by public officers whose duty it is to enforce it, acquiesced in by all for a long period of time, is of great importance in its interpretation *in a case of serious ambiguity* ". (Italics supplied.)

Respondents stress the well-settled principle that statutes exempting property from general taxation must be strictly construed against the property holder. In the court's opinion,

however, even a strict construction of the exemption provisions of the Tax Law requires a holding that the relator is entitled to exemption.

Relator has been held exempt from taxation under the Federal Income Tax Law, the New York State Franchise Tax Law, and the New York City Business Tax Law. These exemptions, however, were granted by administrative agencies and were allowed under different tax statutes. Respondents therefore correctly take the position that said exemptions are irrelevant to the proper determination of the instant proceeding.

Respondents urge also that the fact that on dissolution relator's assets are to be distributed to charitable institutions is insufficient by itself to entitle it to exemption, since the law requires that the enterprise itself be charitable, regardless of the disposition of the income to charitable purposes (*People ex rel. Mizpah Lodge* v. *Burke*, 228 N. Y. 245, 249, *supra*). The court is in complete accord with this contention of respondents. The instant case, however, is not one where the disposition of the income to charitable purposes is sought to be availed of in order to obtain exemption for a corporation whose purpose is not charitable within the meaning of the Tax Law. The present relator, as previously pointed out, is organized for a charitable purpose and is devoting its property to the effectuation of said charitable purpose.

For the reasons indicated the court holds that relator is entitled to prevail, and that its property is exempt from taxation.

The foregoing constitutes the decision of the court. Submit final order on two days' notice.