## TRUSTEES OF AMHERST COLLEGE *vs.* ASSESSORS OF AMHERST.

### SAME *vs.* SAME.

### SAME *vs.* SAME.

### SAME *vs.* SAME.

Hampshire.    September 25, 1906. — November 26, 1906.

Present: KNOWLTON, C. J., MORTON, HAMMOND, & BRALEY, JJ.

*Tax*, Abatement, Exemption.  *Amherst College.*  Words, "Tax bill."

The list of taxable property required of taxpayers by R. L. c. 12, § 41, the filing of which within the time fixed by the notice is made by § 74 of the same chapter a prerequisite to an abatement of taxes, must be sworn to before one of the persons authorized to administer the oath by § 43 of the same chapter.

In the requirement of R. L. c. 12, § 73, that an application for the abatement of a tax shall be made within six months after the date of the tax bill, the term "tax bill" means the notice which the collector is required to send to each taxpayer of the amount of his tax; and such a notice on a postal card properly addressed stating the amount of the tax and for what, from whom and to whom it is due and where and when it is to be paid, and stamped with a post mark showing the day on which it was mailed although not otherwise dated, is a sufficient tax bill within the meaning of the statute, so that an application for an abatement of the tax filed more than six months after the date of such a notice is too late.

Under R. L. c. 12, § 5, cl. 3, parcels of real estate belonging to a college consisting of a house used as the residence of the president of the college and also for his official entertaining and for meeting members of the faculty, students and others who wish to see him on business, another house used as the residence of the professor of astronomy and also for astronomical work and to some extent for

hearing classes in astronomy, a grove open to the public as a park and used as a place of recreation by such students of the college as wish to walk, stroll or saunter there, a field used for outdoor sports especially at times when a larger athletic field belonging to the college is not available, and a triangular lot given to the college to make a suitable approach to the larger athletic field, are occupied for the purposes for which the college was incorporated within the meaning of the statute, and consequently are exempt from taxation.

A house assessed at $800 and a barn assessed at $300 standing on land assessed at $700 and situated a short distance in the rear of the official house of the president of a college without any fence or other indication of boundary between the two properties, built for a servant of a former president who was a janitor of the college while he lived in the house, the house being let to a person not in the employ of the college at a rent of $35 a quarter, and the barn being used by the president of the college for storage purposes, are not occupied by the college or its officers for the purposes for which the college was incorporated within the meaning of R. L. c. 12, § 5, cl. 3, and consequently are not exempt from taxation.

FOUR PETITIONS by the Trustees of Amherst College, incorporated by St. 1824, c. 84, for the abatement of taxes on certain real estate for the years 1901, 1902, 1903 and 1904. In the Superior Court the cases were heard by *Aiken,* C. J., without a jury, and were disposed of and reported to this court in the manner stated in the opinion.

The parcels of real estate belonging to the petitioners, which are held by this court to have been exempt from taxation when assessed for the years 1903 and 1904, were the President's House, Parsons Street Property or Parsons Street House, Todd House, Hallock Grove, Blake Field and Woodside Lot. All of these were included in the petitions for both of the two years named except the Woodside Lot which was included only in the petition for the year 1904. The use of the Parsons Street Property is described in the opinion. The use of the other parcels was found by the judge of the Superior Court to have been as follows:

### The President's House.

The president's house is a structure of generous dimensions, of fine architectural appearance, with an appropriate setting of lawn and adjacent grounds, in convenient proximity to the other college buildings. On the first floor are a large hall, extensive parlors, two smaller rooms and a dining room, all so arranged as to open together in an ample way in view of the receptions and entertainment given there by the president in the

discharge of social functions pertaining to the office.   Attached to the rear portion of the main structure is a wing containing a library room of good size used by the president as library, study and office.   In the upper story are chambers.   This house is occupied by President Harris and his family as a private residence. At the same time, the usages and customs of the college impose upon the president certain social obligations.   In commencement week of each year a reception is given by the president to the college alumni and the senior class and their friends.   At other times receptions are given to each class, first the freshmen and later the sophomores and then juniors and seniors.   From time to time individual students are invited to dine.   The social observances and usages of the character mentioned are not matters of express requirement or exaction.   They are, however, expected of a president in the use of the house, and non-compliance with them unquestionably would subject him to unfavorable comment from the trustees and others, or would, at least, be regarded as a failure on his part to discharge the obligations of hospitality associated with his official position.   In the case of President Harris the expenses of entertaining are borne by him from personal preference, but former presidents have been given an appropriation from the college funds for such purposes.   Fuel, lights, water and other incidents of housekeeping are supplied by the president.   The repairs of the house and the care of the grounds adjacent are attended to by the college.

Meetings of the faculty are held in a room known as the faculty room, in Walker Hall, one of the college buildings, and in the usual course of college business the president is in that room an hour every morning for the convenience of students, and after that he is at his house where usually in the library he meets members of the faculty, students and others who wish to see him on business.   In the library the various committee meetings of the faculty are held.   The principal committee of the faculty, known as the administrative committee, meets regularly on Monday evenings there.   The books in the library are the president's own.   A considerable part of his official work is done there, including his correspondence, though sometimes he goes to the treasurer's office and dictates letters to the stenographer in that office.

## Todd House or Observatory House.

The property, described by either of the above designations, consists of a dwelling house and about an acre of land appurtenant. The designation Todd House is used in the report for convenience and brevity. The house takes that name from David P. Todd, the professor in charge of the astronomical department of the college. An observatory, in process of construction at the times of the several hearings on the petitions, is about three hundred feet from the house.

The house, since Professor Todd moved into it in 1898, has been used first of all as a residence for himself and his family, consisting of Mrs. Todd, a daughter, and Professor and Mrs. Loomis, Mrs. Todd's parents, and in that respect its use has not differed essentially from the use of other houses by other professors of the college. Water, heat, light and all the other incidents of household maintenance and domestic economy were burdens borne by Professor Todd and in no part assumed by the college. From time to time parties and receptions have been given there by Professor and Mrs. Todd as individual hospitality and not at the expense of the college. The care of the grounds adjoining the house has been at the expense of Professor Todd. Owing to the transference of the astronomical department from old quarters to new, there have been uses to which the house has been put during his occupancy which differ from the ordinary uses of a family home. A portion of the cellar was used for the purpose of making tests to ascertain whether there were vibrations of the hill due to passing trains. It was found there was such disturbance and a method of overcoming its harmful effect was discovered by Professor Todd. He has been making in another part of the cellar experiments in possible improvements in methods of navigation. Professor Todd testified that the experiments were in part his private work and that he should not necessarily consider them the property of the college, but the question might arise if the experiments were brought to a successful conclusion, that they were also part of his work as an astronomer and were akin in their nature to astronomy. In another portion of the cellar or basement is the laundry, a good sized room, part of which was used in 1901, 1902 and 1903 for

storing instrument cases brought back from different expeditions and also a considerable part of the machinery of the old observatory in transit to the new observatory. Another room in the cellar also is used for storing instrument cases.

On the ground floor is the dining room, which in 1901, 1902, 1903 and 1904 was used between meal times to some extent for hearing classes in astronomy. Opposite is the parlor, which has no official use. In the hall are kept many of the weather records issued by government weather officials, which there are open to consultation by any one interested in them. These weather records are proper for an astronomer in reference to his work. In the hall are also tripods for instruments, all kinds of surveying instruments, and small telescopes which are carried out to the lawn and there used as occasion requires. On the same floor is a library of books belonging in the main to the college and a few to Professor Todd. In this room also the classes in astronomy usually meet as occasion requires, when the dining room is not used for recitations. In another of the rooms on this floor are one of the clocks belonging to the observatory and chronometers and sextants in use in the department of navigation.

### Hallock Grove.

Hallock Grove is a tract of seven acres of woodland; it is distant from the central portion of the college grounds about a ten minutes walk. The deed of conveyance to the college trustees, made in 1868, from Leverett Hallock, after whom the property takes its name, recites that the property "is conveyed expressly for a Public Park and if perverted to any other use it is to revert to the grantor or his heirs. Said Park is to be open to the public under such reasonable regulations as the said trustees shall see fit to adopt. No trees are to be cut on the premises except under the direction or assent of said trustees and when so cut the avails thereof shall be appropriated to aid indigent students in Amherst College.

" A strip of land on the west side 25 ft. wide and on the south side of 30 ft. wide is to be reserved for a road or highway and the said west and south lines are to be centers of roads on the west and south sides of said land."

The trees composing the grove are old growth oaks, pines,

maples and hemlocks indigenous to the soil. The undergrowth has been cleared out from time to time by the college treasurer, under whose charge the grove has been placed by the trustees. One or two paths have been wrought through the woods. The property is open to whoever desires to go there and is used by people of Amherst and by the students as a place of recreation, but the extent of such use appeared to be inconsiderable. Whatever has been expended upon the property has come from the general funds of the college. The income from the property since the deed of gift amounts to about $125, of which $75 was derived from large trees blown down in a fierce storm some years ago and sold for timber. The income has been used in part as scholarship gifts to two indigent students and the remainder has been used as an auxiliary to the Students Loan Fund and lent to indigent students at a low rate of interest. The amount so lent in 1903 was $96.60 at the rate of four per cent per annum. The total expenditure upon the grove made by the college has been within two and three hundred dollars. The grove is not used for college purposes other than as a place of recreation for students who may wish to walk, stroll or saunter there. Mention of the grove is made in the college catalogue, but no use is therein prescribed, nor is any use scheduled in any printed college curriculum.

## Blake Field.

Blake field, a lot of about seven acres, adjoins the premises on which stand the Todd house and the observatory, and is separated by a street from Hallock grove. Lucien Blake of the class of 1877, from whom the field takes its name, was interested in athletics and secured subscriptions for the purchase of the property, which was acquired by the college in 1881. It was laid out and graded at an expense of about $7,000, with a track and a baseball ground, and was one of the best athletic fields in the country at that time. On it were held the outdoor athletic contests and exercises, both collegiate and intercollegiate. In 1888 or 1889 another athletic field, known as Pratt field after the donor, was given to the college, and since that time Pratt field has been the arena of the principal athletic events in baseball, football and other outdoor sports, in contests between

classes, fraternities and other colleges. Pratt field is an enclosed area with baseball and football grounds, a track, and a grand stand for spectators. By reason of the character of the soil which dries quickly Blake field can be used in the spring about three weeks earlier than Pratt field, and for that reason the college nine begins its preliminary outdoor practice and training on Blake field, going to Pratt field as soon as it is in a condition for use, after which the use by the college boys of Blake field drops off, though it still is resorted to by the students for minor matches and games between classes and fraternities, if Pratt field is occupied at the time. The town boys of Amherst are allowed free use of Blake field as a ball ground, and games are played there between scrub teams made up of boys and young men not members of the college and between nines and elevens of the Amherst high school and other schools. There is no income derived by the college from Blake field.

The football and baseball teams are student organizations controlled by the faculty. Every student is expected to perform a certain amount of physical exercise. It is left to the department of physical education and hygiene to determine the amount and kind.

### Woodside Lot.

Woodside lot, a piece of property which appears only in the petition for the year 1904, is a triangular area of land, one hundred and thirty-six feet on each of two sides and one hundred and ninety-seven feet on the third side, containing ten thousand four hundred square feet, which is about equal to the average house lot in the vicinity. This triangular lot is near the principal entrance to Pratt field, and one of the angles of the triangle is opposite that entrance and fifty feet distant from it. There is and was sufficient room for a crowd to enter or leave Pratt field without coming in contact with the triangle, but the usual and natural course of the principal part of the travel on foot is to cut across the corner of the triangle near the main entrance. Mr. Pratt, the donor of Pratt field, purchased this triangular lot and gave it to the college. At the expense of the college it has been smoothed over, levelled and put in condition. The purchase was made from aesthetic considerations. The appearance of the approaches to the main en-

trance of Pratt field has been improved by the treatment of the triangle since its acquisition by the college and is helped by having the triangle remain open. No building is in contemplation upon this lot. No financial profit has been derived from this property by the college and none is likely to be.

*M. F. Dickinson & W. B. Farr*, for the petitioners.

*W. J. Reilley*, (*W. G. Bassett* with him,) for the respondents.

MORTON, J. These are four petitions for the abatement of taxes assessed upon real estate of the petitioners in the town of Amherst by the assessors of Amherst for the years 1901, 1902, 1903 and 1904. Abatements were refused by the assessors and thereupon the taxes were paid under protest and appeals taken to the Superior Court. The cases were heard together by a judge without a jury. The petitioners contended in each case that the property was exempt from taxation. The judge found for the petitioners in each case and ordered judgment against the inhabitants of the town for the amount paid, with interest, and by agreement of parties reported the cases to this court; judgment to be entered on the findings if correct, otherwise such judgments to be entered as the court should deem proper.

The respondents contend generally that the property was rightly assessed. They contend further in regard to the taxes assessed for the years 1901 and 1902 that the lists filed by the petitioners were not sworn to, and the judge found, as a fact, that they were not. They contend still further in regard to the tax for the year 1901 that the application for abatement was not made within six months after the date of the tax bill.

We take up first these formal matters, assuming, without deciding, that the provisions of the Revised Laws in regard to abatements apply to the tax of 1901 though it was assessed before they went into effect. Some contention is made by the petitioners that the evidence, which is stated in the report, did not warrant a finding that the lists of 1901 and 1902 were not sworn to. But we deem it enough to say of this contention that the finding appears to us to have been clearly warranted by the evidence. The question remains on this branch of the case as to the effect of the finding on the right of the petitioners to an abatement of the taxes for those years.

The petitioners concede that previous to the Revised Laws the

filing of a sworn list was a condition precedent to an abatement (*Otis Co.* v. *Ware*, 8 Gray, 509; *Charlestown* v. *County Commissioners*, 101 Mass. 87); but they contend that this has been changed and that now the list need not be sworn to unless required by the assessors; in other words, that the sworn list, which was formerly compulsory, is now optional with the assessors. They rely, for this contention, on the fact that the list to be furnished is that required by § 41 of R. L. c. 12, and that there is no express provision in that section as there was in the corresponding section in the Public Statutes (c. 11, § 38), that the list shall be sworn to. They also rely upon the fact that a verification on oath of the list is expressly required in the case of an applicant for abatement of his real estate tax when the notice did not require real estate to be included in the list brought in by the taxpayer. But it is manifest we think that the list required in § 41 is a sworn list. It is the list which taxpayers are to bring in in accordance with the notice which the assessors are required to post. And § 43 provides that "The assessors shall in all cases require a person bringing in a list to make oath that it is true," meaning, as we think, that the list referred to in § 41 when brought in shall be sworn to, and that the assessors or their secretary or head clerk may administer the oath, and that, until sworn to, it is not the list which the taxpayer is required to bring in. The omission from § 74 of R. L. c. 12 of the requirement of an oath was no doubt for the purpose of condensation and is immaterial so long as the list required by § 41 is a sworn list. The section (§ 74) is as reported by the commissioners, except that the numbering has been changed, and they make no reference to any change in the law in regard to a sworn list as intended or desirable. See Report of Commissioners for consolidating and arranging the Public Statutes, c. 12, § 76. The provision for a sworn list where the notice does not require real estate to be included has no tendency to show that the other list required in § 74, and which is the one that we have been considering, need not be a sworn list. It relates to a different situation, and, if anything, tends rather to show that the other list must also be a sworn list. It follows that the action of the assessors in refusing to abate the taxes assessed for the years 1901 and 1902 was right because

sworn lists were not filed as required by statute, and that the finding of the Superior Court in favor of the petitioners for the amounts paid for those taxes, and interest, was wrong.

We also think that application for the abatement of the tax of 1901 was not made within six months after the date of the tax bill. The statute provides that " The collector shall forthwith, after receiving a tax list and warrant, send notice to each person who is assessed, resident or non-resident, of the amount of his tax." R. L. c. 13, § 3. An examination of the corresponding sections of previous statutes shows that, in St. 1889, c. 334, § 1, of which the present provision is a re-enactment, the word " notice " was substituted for the term " tax bill " which had been the word used hitherto, but the term " tax bill " was still retained in the provision relating to an application for an abatement. R. L. c. 12, § 73. Manifestly as there used it has reference to the notice which the collector is required to send to each taxpayer of the amount of his tax. In the present case the notice that was sent consisted of a postal card which bore on its face the address, " Amherst College, Amherst, Mass.," with the postmark " Amherst Mass., July 17, 1901 " and on the back the words printed and written that are printed in the footnote.* We think that this constituted a tax bill within the meaning of the statute. It contained the amount due, for what and from whom and to whom due and where and when to be paid. It was not dated by the collector, but the postmark showed when it was sent out and that was a sufficient date. The application for abatement was not made till March 22, 1902, which was clearly too late.

There remain the taxes for the years 1903 and 1904. In regard to these the only question is whether the several parcels of real estate for which the petitioners were assessed were or

---

* The words printed and written on the back of the card were as follows:

Tax Collector's Notice.

M. . . . . . Amherst College

| | | |
|---|---|---|
| Your town county & state taxes for 1901 are | $1542.60 |
| Watering Streets | 17.50 |
| Taxes are now payable at the collector's office | |
| Interest added after October 10, 1901. | |

C. H. Edwards, Collector town of Amherst, Mass.

were not exempt from taxation. The principles of law applicable to cases of this kind have been recently stated and applied in several cases and it is not necessary to restate them. *Emerson* v. *Milton Academy,* 185 Mass. 414. *Phillips Academy* v. *Andover,* 175 Mass. 118. *Harvard College* v. *Cambridge,* 175 Mass. 145. *Amherst College* v. *Amherst,* 173 Mass. 232. *Williams College* v. *Williamstown,* 167 Mass. 505. *Mount Hermon Boys' School* v. *Gill,* 145 Mass. 139. *Massachusetts General Hospital* v. *Somerville,* 101 Mass. 319. Applying the rules thus laid down we think that the presiding judge was warranted in finding upon the facts before him that of the parcels for which the petitioners were assessed in 1903 and 1904, the President's House, Todd House, Hallock Grove, Blake Field and Woodside Lot were owned and occupied by the college for the purposes for which it was incorporated and were therefore exempt from taxation. *Emerson* v. *Milton Academy, ubi supra. Harvard College* v. *Cambridge, ubi supra.* With respect to the "Parsons Street Property" as it is called in the petition for the abatement of the taxes of 1903, or "Parsons Street House" as it is called in the petition for the abatement of the taxes of 1904, both descriptions meaning, we assume, the same property, the case stands differently. This property consists of a house assessed at $800, a barn at $300 and land at $700, and is situated a short distance in the rear of the President's House without any fences or other indications of boundary or division between the two properties. The house was built during President Stearns's time, which was from 1854 to 1876, for a servant of his who was a janitor of the college for many years during which he lived in the house. In 1901 and 1902 the house was rented to a man who was not an employee of the college at $35 a quarter. For aught that appears it was so occupied in 1903 and 1904. The barn is used by the president for storage purposes. The land assessed with the house consists of half an acre which is the size of the average house lot on that street. It is the use of the property at the time when the tax is assessed which determines whether it is exempt from taxation or not. And it is plain it seems to us that neither in 1903 nor 1904 was this property occupied by the college or its officers for the purposes for which the college was incorporated.

The result is that the petitions for the abatement of the taxes assessed for the years 1901 and 1902 must be dismissed with costs and judgment entered for the petitioners for the amounts paid for the years 1903 and 1904 less the taxes on the Parsons Street Property, with interest, on the amounts thus ascertained and with costs.

*So ordered.*