University of Pittsburgh Tax Exemption Case.

Argued March 20, 1962.   Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*Maurice Louik,* County Solicitor, with him *Francis A. Barry,* First Assistant County Solicitor, and *James Victor Voss* and *Harold Gondelman,* Assistant County Solicitors, for appellant.

*Charles Covert Arensberg,* with him *George W. Richards, Jr.,* and *Patterson, Crawford, Arensberg & Dunn,* for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, May 3, 1962:

Is the residence of the chancellor of the University of Pittsburgh, owned by the university and located approximately 2½ miles from the university campus, exempt from local taxation? The court below held that it was tax exempt. The propriety of that ruling is now before us.

This large residence, with a curtilage of slightly over one acre of land on Beechwood Boulevard, Pittsburgh, was purchased by the university as a residence for its chancellor in June, 1956. The taxing authorities placed the property in a tax exempt status for 1957 and 1958 but, on July 20, 1959, the university was notified that the property was being placed in a taxable status for 1959 at an assessed value of $45,000. The university appealed to the Board of Property Assessment, Appeals and Review of Allegheny County (Board) but the Board denied the appeal. On appeal to the County Court of Allegheny County, Judge BECK, after hearing, directed that the property be placed in a tax exempt status and from that order the County appeals.

The Constitution exempts nothing from taxation but simply permits the General Assembly to exempt within a limited and restricted area: *City of New Castle v. Lawrence County,* 353 Pa. 175, 44 A. 2d 589. Section 1 of Article IX of the Constitution authorized the Gen-

eral Assembly to exempt from taxation "public property used for public purposes, actual places of religious worship, places of burial not used or held for private or corporate profit, institutions of purely public charity and real and personal property owned, occupied, and used by any branch, post or camp of honorably discharged soldiers, sailors and marines." Section 2 of the same Article provides: "All laws exempting property from taxation, other than the property above enumerated shall be void."

Pursuant to this constitutional authority, the General Assembly under The General County Assessment Law,[1] Section 204 provided: "The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit: . . . (c) All hospitals, universities, colleges, seminaries, academies,. associations and institutions of learning, benevolence, or charity, including fire and rescue stations, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed, and maintained by public or private charity: Provided, That the entire revenue derived by the same shall be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose; (1) . . . Except as otherwise provided . . . all property, real or personal, other than that which is in actual use and occupation for the purposes specified in this section, and all such property from which any income or revenue is derived, other than from recipients of the bounty of the institution or charity, shall be subject to taxation, . . . ."

In the disposition of this appeal we are bound not only by the provisions of the Constitution and the Act of 1933, supra, but also by certain principles well settled in this area of the law. In the first place, a claim-

---

[1] Act of May 22, 1933, P. L. 853, 72 PS §5020-101 et seq.

ant for a tax exemption has the burden of bringing himself within the exemption statute: *Wynnefield United Presbyterian Church v. City of Philadelphia,* 348 Pa. 252, 35 A. 2d 276; *Com. v. Clark,* 344 Pa. 155, 25 A. 2d 143. In the second place, statutory provisions exempting property from taxation are subject to a strict, not a liberal, construction (Statutory Construction Act of May 28, 1937, P. L. 1019, §58, 46 PS §558 (5); *Y.M.C.A. v. Reading,* 402 Pa. 592, 167 A. 2d 469; *McGuire v. Pittsburgh School District,* 359 Pa. 602, 60 A. 2d 44; *Meadville City v. Odd Fellows' Home,* 128 Pa. Superior Ct. 180, 193 A. 662) and to this rule of construction there is no exception in the case of property owned by nonprofit educational institutions devoted to educational purposes and objectives.[2] In the third place, we must apply the well settled rule that findings of fact of a trial judge, confirmed by the court en banc, have the force and effect of a jury verdict and will not be set aside unless such findings lack sufficient evidential support. In the fourth place, the fact that the residence of the president, chancellor or head of a university or college is *not located* on the campus is not controlling: *Meadville City v. Allegheny College,* 131 Pa. Superior Ct. 343, 200 A. 105. In *Meadville,* supra, it was held that the residence of the president of Allegheny College was tax exempt from local taxation even though the residence was not on the college grounds, the Court stating (p. 344): "That the exemption applies even though the building is not an-

---

[2] The court below stated, inter alia: "Ordinarily constitutional provisions and statutes exempting property from taxation are strictly construed against those claiming exemptions. However, the rule of strict construction is not involved where property is owned by non-profit educational institutions and devoted to educational purposes and objectives. In such cases a liberal and reasonable construction rather than a strict construction of constitutional provisions and statutes is applied." In this respect, the court below erred.

nexed or contiguous to the campus or college grounds [citing cases]." Other jurisdictions are in accord: *In re Syracuse University*, 209 N.Y.S. 329, aff'd. 214 App. Div. 375; *Rutgers College v. Piscataway Township*, 20 N.J. Misc. 127, 25 A. 2d 248.

On one occasion, our Court has spoken on the tax exemption status of the residence of a college president: *County of Northampton v. Lafayette College*, 128 Pa. 132, 18 A. 516. In that case the issue was the exemption from taxation of certain dwellings used as residences for professors, the college gardener, the president's secretary and the president.[3] In upholding a tax exemption for all these dwellings the Court *assumed* as a general proposition "that a president's house is a necessary part of the plant of every well regulated college . . . ." (p. 140) In *Parmentier Trustees', Appeal*, 139 Pa. Superior Ct. 27, 11 A. 2d 690, the Superior Court stated (p. 33) : "Universities, colleges, academies, schools and institutions of learning *which come within the statutory classification,* are held exempt from taxation . . .; and this exemption extends not only to quarters used for employees and for dormitories and dining halls used for the students but *also to buildings . . . used by it to house the president* and faculty. [citing cases]." (Emphasis supplied) in *White v. Smith,* 189 Pa. 222, 42 A. 125, we held that a convent used as a residence for teachers in a parochial school was tax exempt. Cf: *Dougherty v. Philadelphia,* 314 Pa. 298, 304, 305, 171 A. 583, wherein this Court held that so much of a building, used both as

---

[3] At the time of that appeal the residence of the president was not occupied by the president. There is an intimation that at the time Lafayette did not have a president. The residence had been donated to the college as a residence for the president but was being rented to a stranger to the college at an annual rental of $550, which rent was applied to payment of the general expenses of the college.

the rector's residence and the office of the rector acting as principal of an adjoining school, as was used as a rectory was taxable.

The real nub of this controversy is the use to which the residence of the chancellor is put.[4] The burden was upon the university to establish the primacy of the use of this residence in furtherance of the general purposes of the university. The court below found as a fact that the residence was "used to receive and entertain student organizations, members of the faculty and administrative staff, alumni, donors, members of the Board of Trustees, visiting presidents, deans, faculty and students from colleges and universities of the United States and foreign countries, government officials of the United States and foreign countries, and leaders in the fields of education, the learned professions, science and business" and that the "dominant use of the Chancellor's official residence[5] is that of an integral part of the larger educational functions and objectives of the University of Pittsburgh in accordance with policy determined by the Trustees and executed by the Chancellor."

The university or college of today is a far cry from "Mark Hopkins at one end of a log and a student on the other"[6] of another not too distant day and age. The

---

[4] In *Mullen v. Commissioners of Erie County*, 85 Pa. 288, 292, it was said: ". . . it is the use, not the building, which defines the exemption. But the use which is made of a place is a present fact, not something ideal or in contemplation merely."

[5] In this connection it is to be noted that the university furnishes the chancellor with a $10,000 allowance for the expenses of the residence, maintains the residence by the university maintenance staff and pays the costs of all utilities. Five full-time employees at the residence are paid in large part by the university and two student employees live on the premises and act as watchmen.

[6] Misquoted from a speech given by James A. Garfield at Williams College (1872) : "A pine bench with Mark Hopkins at one end of it and me at the other is a good enough College for me".

universities and colleges of today are mammoth in the size of their student bodies, faculties and physical equipment compared to the universities and colleges of just several decades ago. Corresponding with this growth has been the enlargement and enhancement of the functions, frontiers and objectives of these institutions. The successful university or college of today cannot remain provincial in outlook but must be national and even international in both outlook and contacts. To a university, such as the University of Pittsburgh, come students, undergraduate and postgraduate, teachers and researchers not only from all over our country but from countries all over the world. To a university such as in the case at bar officials, both of high and low rank, of our own and foreign governments come for aid in research and understanding. The functions of a modern university are and must be almost unbelievably broad in scope and its influence is evident in many and varied fields.

The head of such an institution, whether he be called president or chancellor, represents to the public eye the "image" of the institution. Both an educator and an administrator of the tremendous "business" which any university or college now is, he must also be the official representative to host those who, for one reason or the other, find the university or college a place of interest and, if he is to assume the full scope and responsibility of his duties to the university or college, he must be universal in his contacts. Many years ago the Supreme Judicial Court of Massachusetts in *Amherst College v. Assessors*, 193 Mass. 168, 170, 79 N.E. 248 stated: "At the same time, the usages and customs of the college impose upon the president certain social obligations. . . . The social observations and usages of the character mentioned are not matters of express requirement or exaction. They are, however, ex-

pected of a president in the use of the house, and non-compliance with them unquestionably would subject him to unfavorable comment from the trustees and others, or would, at least, be regarded as a failure on his part to discharge the obligations of hospitality associated with his official position. . . ." The residence of the head of a university or college necessarily renders a real function, tangibly and intangibly, in the life of the institution. While its utility to the purposes and objectives of the institution is incapable of *exact* measurement and evaluation, it is nonetheless real and valuable.

We have carefully examined the instant record and are satisfied that there is sufficient competent proof of record to support the findings of the trial judge. Bearing in mind the enlarged functions of the modern university or college and its president or chancellor, we are satisfied that the majority of the events for which the residence was utilized during 1957, 1958 and 1959 bore a direct relationship to the proper functioning of the University of Pittsburgh and served its aims and objectives. In our view, the residence of the chancellor fully meets the standard required under both the Constitution and the Act of 1933, supra, to qualify for a tax exempt status.

Order affirmed. Costs on County.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Every adult person in the Commonwealth carries on his back an invisible sack into which the government periodically drops an ever-increasing burden of taxes. If any person somehow manages to keep his sack closed and empty and the tax-man passes him by, this does not mean that the tax which the escaping person does not pay is lost to the government. The tax-man places the weight of that uncollected tax into other sacks so that the other persons in that given area or classifica-

tion are required to carry heavier loads than otherwise would be theirs. For that reason, if for no other reason, every citizen is interested in seeing to it that there is not lifted to his shoulders a millstone which belongs to someone else.

While taxation applies to all persons uniformly, an appreciation of the obligations owed by society to certain nonprofit entities causes government to exempt schools, churches, hospitals and charitable institutions from tax levies. The exemptions, however, must be bona fide and they must be strictly applied because, as already stated, what is not paid by one entity or person will be exacted from other persons or entities. Thus, the law proclaims that not everyone in the vicinity of institutions enjoying a rain bath of tax immunity is entitled to that same immunity merely because he stands close enough to feel the splash and the coolness of the exempting waters.

The question involved in the appeal before us is whether the Chancellor of the University of Pittsburgh is relieved from paying taxes on the house in which he lives. If this dwelling is his domicile and he uses it only as his home, he is obliged to pay taxes on it like everybody else pays taxes on his home. If, on the other hand, his house is in effect an adjunct of the University of Pittsburgh, the property falls within the same tax exemption allowed the University. The County Court of Allegheny County, after a hearing on the subject, decided that the Chancellor's home is really a facility of the University of Pittsburgh and therefore enjoys the same prerogatives as the University insofar as governmental fiscal obligations are concerned. The Majority of this Court has affirmed that finding.

I do not agree.

The Statutory Construction Act (Act of May 28, 1937, P. L. 1019, §58, 46 PS §558(5)) provides: "All provisions of a law of the classes hereafter enumerated

426

shall be strictly construed: . . . (5) Provisions exempting persons and property from taxation." In the case of *Ogontz School Tax Exemption,* 361 Pa. 284, we said: "A claimant for exemption *must bring himself clearly within the exempting statute."* (Emphasis supplied)

Did the Chancellor bring himself clearly within the exempting statute? The Majority Opinion does not go into the facts of the case and is wholly satisfied to accept the findings of the court below. My study of the record convinces me that the evidence submitted at the hearing did not place the Chancellor's residence within the curtilage of the exempting statute.

The residence in controversy is a large, three-story brick Georgian style house with 15 rooms and 4½ baths, located at 1129 Beechwood Boulevard, Pittsburgh. It reposes amidst extensive lawns which cover approximately an acre of ground. The household consists of the Chancellor, his wife, four children and a nursemaid.

When the present Chancellor, Dr. Edward H. Litchfield, was invited by the Trustees of the University, in 1955, to accept the post of Chancellor, he was informed that he would live in a comfortable, three-story modern residence at 651 Morewood Avenue, where the previous Chancellor had lived. Dr. Litchfield did not like this house. He inspected many dwellings and finally selected the one on Beechwood Boulevard as the one he preferred and the University purchased it for $75,000. He moved into the property in 1956. For two years it enjoyed tax exempt status but in 1959 the county taxing authorities declared it taxable as a private residence. The County Court of Allegheny County reversed this assessment and the Majority of this Court has now affirmed the lower court's decision.

The domicile of a university head, in order to be declared tax-exempt on the basis that it is part of the

university, should have some geographical, cultural and pedagogical kinship with the university itself. The present Chancellor's home is located two and one-half miles from the University campus and is physically isolated from the University by many business establishments, public thoroughfares, public buildings and innumerable other residences. Given this distance and professional detachment, the Chancellor in his home cannot exercise directional, supervisional or disciplinarian control over students and faculty at the University. The Morewood home, although still not on the University campus, was located only one mile from the main campus grounds.

Applying the unmistakable intent of the Statutory Construction Act, as heretofore quoted, the University had the evidentiary burden at the hearing in the court below to prove that the Beechwood domicile formed an integral part of the whole University educational plan. It did not meet this burden. There was no evidence that the Chancellor carried on university administrative functions in this house, there was no evidence of any routine of meetings with students and faculty members in the house, there was no evidence that classes of any kind were ever conducted in the house.

But the University counsel argue that the Chancellor needs this large residence because of the many official receptions, entertainment events and meetings which come within the sphere of his official functions. Dr. Litchfield himself testified that during the year 1960, 2,200 people called at his home. When I first saw this statement in the record I visualized this long parade of 2,200 persons coming to the Chancellor's home to talk with him and discuss with him the many educational problems of the University and I must admit I sensed an instinctive sympathy for the Chancellor who had to devote so much time and energy in handling so many individual problems. However, when

I examined the nature of the events which brought so extraordinarily large a number of callers to the Chancellor's home, I found that 775 of them came to dance! The exhibit submitted by the University in this connection shows that on October 7, 1960, there was held at the Chancellor's home a Dance for University Faculties and that 775 persons attended.

I recognize that entertainment and even dances are part of the inevitable social life of any modern educational institution, but it should not be the responsibility of the president of a university or college to provide the facilities for such events. Dr. Litchfield has himself stated that he preferred to use his home only as a home, and there is no reason why, insofar as the record in this case is concerned, he may not do so. The head of a large university is entitled to peace and quiet in his home and is not required to endure the moanings and groanings of saxophones with the ear-splitting assaults of piercing trumpets and detonating drums producing the cacophony for gyrating dancers performing the contortions and non-cerebral terpsichorean monstrosity known as "the twist."

While modern education is imparted in an atmosphere quite different from that which prevailed within the classic shades of Plato's Academy and Aristotle's Lyceum, the large majority of students still look upon education as something serious and solemn and a preparation for the awesome responsibilities of life. The Chancellor or President symbolizes that dignified dedication and he should not have to supply the quarters for the off-campus entertainment of students.

Of course, it is self-evident that distinguished visitors will come to so large and justly-renowned a university as the University of Pittsburgh, and there should be a place within the University, and worthy of the University, to receive these personages and provide for their needs and comfort. The University of Pittsburgh

apparently has such a place and it is known as Bruce Hall in the Schenley Apartments. Dr. Litchfield testified that Bruce Hall is "used primarily as a group facility for visiting people on the campus who come and stay there overnight, who sometimes have breakfast and sometimes luncheons and dinners and who frequently bring staffs with them and have their own meetings there in the library in conjunction with their sleeping quarters. Examples of this are the Prime Minister of Turkey and his staff used this as a guest facility; the Director of the Iranian Plan Organization and his immediate entourage used it for sleeping, for part of their meals and for meetings; and the President of the International Political Science Association also has part of his Executive Committee there and meetings there. The heads of two large foundations now Pittsburgh Foundations have been there just recently and brought part of their staff along with them and had their meetings there. Middle States Accrediting Association which was with us just a few months ago, the head of that group and three vice chairmen stayed there, had their breakfast there, had their evening meetings there in connection with the accreditation of the University. Distinguished academic people from abroad most of whom I do not know will come and stay there and maybe use one room or two bedrooms as the case may be."

When the Chief Justice of the United States, the Honorable Earl Warren, spoke at the University commencement exercises, the reception for him was held at Bruce Hall.

The Majority Opinion states, and of course properly so, that the home of a university president need not actually be annexed or contiguous to the campus or college grounds in order to be tax exempt. That is so, but it must nevertheless be reasonably close to the campus and above all it must be used primarily for the benefit of the university or college as such.

The record supplies the interesting historical data that the two veteran Chancellors of the University of Pittsburgh—Dr. Samuel B. McCormick, who was Chancellor for 16 years from 1904 to 1920, and Dr. John G. Bowman, Chancellor for 24 years from 1921 to 1945—were not supplied official residences by the University. Mr. G. Stanley Rupp, Treasurer of the University, testified that Dr. Bowman, under whose administration the spectacularly beautiful and magnificent Cathedral of Learning was built, lived on North Dithridge Street during his entire tenure as Chancellor and "owned or rented" his residence. It is interesting to note also, as established by a memorandum introduced in evidence by counsel for the University of Pittsburgh, that the eminent Temple University of Philadelphia does not supply a residence for its President.

The Majority Opinion cites the case of *Rutgers College v. Piscataway Township,* 20 N.J. Misc. 127, 25 A. 2d 248, as persuasive authority for exempting the home of a university president from taxation. I believe, however, that that case better supports the position I am here defending. In that case the State Board of Tax Appeals said: "The actual uses of the building include meetings of the board of trustees of the university, the executive committee of the board of trustees, the New Jersey State Board of Regents, afternoon and dinner meetings of the faculty and various faculty groups, student organizations and groups, conferences of administrative officers and of the deans of the several colleges, and the accommodation of official guests of the university, such as chapel speakers, lecturers . . . and persons in attendance at such activities as the recent celebration of the 175th anniversary of the college. It was satisfactorily shown that *there is hardly a single weekday of the entire year,* exclusive of the month of August, during which the building is not used for one or another of the several types of college uses described hereinabove." (Emphasis supplied)

The infrequent and sporadic official receptions which have taken place in the Litchfield residence cannot, in point of numerousness and intensity of scholastic application, be compared with the beehive activities unceasingly buzzing in the home of the President of Rutgers College, as above indicated.

According to the list submitted by the University of Pittsburgh at the hearing in the court below, the Chancellor's home was used for non-residential functions on only eighteen occasions during the whole year of 1959, the tax year here involved. Four of these events had to do with the Governmental Affairs Institute, of which Dr. Litchfield is a member and which has no connection with the University. Nine of the other events could easily have been held in Bruce Hall. This leaves only five University functions at the Chancellor's home attended by more guests than could be comfortably accommodated at Bruce Hall. Of these affairs, the county solicitor of Allegheny County said: ". . . one was a Christmas party for executive officers of the University, one was a reception for the alumni council and council of deans, one was a garden party for the First Deputy of the U.S.S.R., one was a luncheon for Mr. Archibald McLeish, Honors Convocation Speaker, and one was a reception for the new chairman of the Board of Trustees and his wife."

I do not believe that the taxpayers of Allegheny County should be required to make up the taxes which would otherwise be applied to the Chancellor's home merely because of five events (in one year) which, if not accommodatable at Bruce Hall, could have been held elsewhere. In the case of *Ogontz School Tax Exemption Case,* 361 Pa. 284, this Court said: "Every wage earner and every property owner feels the burden of taxation growing constantly heavier. Millions of American income producers are now forced to pay each year in the form of direct and indirect taxes nearly half of their income for the support of national,

432

state and local governments. The heavier the burden of taxation becomes the more exigent is the demand for its equitable distribution. All those whose persons and property receive the protection of government should bear their just share of its cost unless the law specifically exempts them from doing so. To exempt any institution from paying for the protection it receives means that other property owners, already taxed for their own and their property's protection, must also pay for the protection given that exempted institution and its property."

I have great admiration for the University of Pittsburgh, which is one of the truly great universities of the world. Its graduates have, in various parts of the country and even in distant foreign climes added lustre in the fields of science, the professions and the arts, to the fame of the venerable and pre-Revolutionary-War city of Pittsburgh, whose name the University proudly bears. In athletic prowess the University teams have quickened the pulse of the populations of Western Pennsylvania and parts of West Virginia and Ohio which look upon this University as their own. It is with infinite regret, therefore, that I see this magnificent institution being brought into litigation over so insignificant a sum as is involved in the taxes on the Chancellor's home—I say insignificant, in comparison to the gigantic sums spent by the University in a year in the operation of an establishment which is a small city in itself. With a student enrollment of approximately 13,000, and a faculty and administrative staff of approximately 2,000, the University as one of its publications points out, "has become a complex institution of schools and divisions offering undergraduate, graduate, and professional education, performing scores of public services, supporting a vast research program, and administering a great Health Center. It is large and highly diversified."

. The University spends twenty million dollars a year, five million more than the amount expended by Thomas Jefferson in purchasing one-half of the United States. In view of such leviathan expenditures, why should it be concerned over a small tax item, the payment of which would not only not add significantly to its budget but would serve as a demonstration of its appreciation of the benefits it receives from the entire Commonwealth. The payment of those taxes would also serve as a demonstration, in a tangible way, of its recognition of the democratic idealism involved in taxation.

As stated in the *Ogontz* case, the American people today must give up a very large part of their income for taxes. However, despite whatever hardship and deprivation accompany the payment of those taxes, the taxpayer must still sense a pride in the realization that by paying taxes he is participating directly in our democratic form of government. Moreover, everyone must realize that we derive benefits from government which could not be ours except through this monetary participation in government. In addition, although taxation is a burden, it is also a badge of honor. Although heavy, it is, like the staff which holds upright the Flag of our country, something every true American regards as a privilege to carry.

I subscribe wholeheartedly to what was stated by Justice (later Chief Justice) MAXEY in the case of *Y.M.C.A. of Germantown v. Philadelphia*, 323 Pa. 401, 413: "Taxes are not penalties but are contributions which all inhabitants are expected to make (and may be compelled to make) for the support of the manifold activities of government. Every inhabitant and every parcel of property receives governmental protection. Such protection costs money. When any inhabitant fails to contribute his share of the costs of this protection, some other inhabitant must contribute more than his fair share of that cost."

I would reverse the lower court and require the payment of taxes on 1129 Beechwood Boulevard, which, according to the record in this case, has not been proved to be an adjunct of the University in the sense that it comes within the exempting statute.