Allegheny General Hospital *v.* Allegheny County Board of Property Assessment, Appeals and Review, Appellant.

Argued November 12, 1965. Before WRIGHT, WAT-KINS, MONTGOMERY, JACOBS, and HOFFMAN, JJ. (ERVIN, P. J., and FLOOD, J., absent).

*Thomas M. Rutter, Jr.,* Assistant County Solicitor, with him *Francis A. Barry,* First Assistant County Solicitor, and *Maurice Louik,* County Solicitor, for board, appellant.

*G. Harold Blaxter,* with him *Herman S. Harvey, Jr.,* and *Blaxter, O'Neill, Houston & Nash,* for appellee.

OPINION BY MONTGOMERY, J., March 24, 1966:

The Board of Property Assessment, Appeals and Review of Allegheny County (Board) has appealed from

eight orders of the County Court of said County giving eight parcels of land owned by the Allegheny General Hospital in the City of Pittsburgh with some buildings thereon exempt status for local taxes, the same having been assessed by the Board for tax purposes. The cases were consolidated for trial in the court below and are now before us in consolidated form on appeal.

Two of the properties are contiguous to the main building and grounds of the hospital; three, which together form a parking area, are across Esplanade Street, one of the streets forming the boundary of the main grounds; one is across Retanus Way, another boundary street; and the other two are on East North Avenue on which the main building fronts but are separated from the main building by other properties. The governing board of the hospital determined that the uses being made of all of said properties were "reasonably necessary" for the operation of the hospital and the lower court, after hearing, made the same finding.

The fact that some of the properties are not contiguous to the main hospital property is not determinative of the issue before us. *University of Pittsburgh Tax Exemption Case,* 407 Pa. 416, 180 A. 2d 760 (1962) ; *Barnes Foundation v. Keely,* 314 Pa. 112, 171 A. 267 (1934) ; *Lancaster Theological Seminary Tax Exemption Case,* 207 Pa. Superior Ct. 12, 214 A. 2d 285 (1965).

We need not repeat the basic principles guiding our consideration of these matters since they are expressed by us in *Shadyside Hospital Appeal,* 207 Pa. Superior Ct. 261, 218 A. 2d 355 (1966), to which reference is made.

This is not such a case where we should substitute our judgment for that of the lower court as was done in *Pittsburgh Bible Institute v. Board of Property Assessment, Appeals and Review,* 405 Pa. 297, 175 A. 2d

82 (1961). Therefore, the orders of the lower court are affirmed on its findings and conclusions:

"The evidence clearly establishes the fact that the Hospital's use of these properties as living quarters for its personnel has been primarily in furtherance of the Hospital's functions and needs and should be tax exempt.

"With respect to 204 East North Avenue, it should be noted at the outset that the portions of these premises used as living quarters for interns and resident physicians is presently tax exempt and only the quarters occupied by the custodian of this building and the assistant director of the housekeeping department have been denied is arbitrary and devoid of any reasonable grounds therefor. If it is necessary for the Hospital to house certain interns and physicians in near proximity to its main buildings for the night care of patients, it is just as necessary to provide living quarters to personnel who can furnish proper maintenance to the premises and who can supervise the conduct of its occupants. The custodian and the assistant director of the housekeeping department are responsible for these services and the latter is also charged with responsibility for meeting the emergency needs of the housekeeping department.

"The use of the properties known as 1208 Porterfield Street, 300 East North Avenue and 1213 Esplanade Street cannot be considered apart from the need for a unified direction and operation of the Hospital's dietary department which provides approximately 4,000 meals per day and serves the therapeutic and nourishment needs of a large number of patients and hospital personnel. The functions of the dietary employees complement one another and it is obvious from Mr. Landgraf's explanation of their scheduled turns and hours of work that their ability to reside near the Hospital ensures an orderly and efficient administra-

tion of this department. These properties are 'working dormitories' which enable the Hospital to provide 'round the clock' food service with the added assurance that a crew of dietary employees are always close at hand for emergency situations. It is for the aforegoing reasons that the Hospital uses these properties as either temporary or permanent living quarters for its dietary personnel, and such usage clearly entitles these properties to exemption from taxation.

"During 1959, 1960 and 1961, the property known as 604 West North Avenue was used by the Hospital as living quarters for its administrative assistant to the superintendent, the chief dietitian, resident physicians in the same category as those physicians residing in the tax exempt portion of 204 East North Avenue and a maintenance man or 'associate engineer' who was available for night emergency duty at the main building.

"Considering the scope of the Hospital's operations and the all-too-frequent instances of emergency situations, the Hospital's decision to provide proximate living quarters to a member of its executive staff who could assume overall responsibility for directing the hospital forces is not open to serious challenge. Miss Montgomery's residence at 604 West North Avenue is solely and directly attributable to that decision. The testimony given by the hospital Superintendent, Mr. Landgraf, its inherent probability, his vast experience in the work, his attitude and demeanor as a witness on the stand, indeed the credibility and weight properly attributed to all the witnesses—taken together are impressive and acceptable.

"Mr. Landgraf's thorough exposition of the modus operandi of the dietary department patently demonstrates the need for constant coordination and supervision and, therefore, the decided value to the hospital in having its chief dietitian in residence near the hospital.

"During the period in question, 604 West North Avenue was also utilized as a residence for interns and resident physicians who were on an educational program and who served the hospital in the same capacity as those physicians residing at 204 East North Avenue. The latters' living quarters have been placed in the tax exempt column and there is no logical reason for denying tax exemption to that portion of 604 West North Avenue which housed physicians of equivalent status.

"The property known as 604 West North Avenue also includes a carriage house or 'coach house' which was occupied by the maintenance man. Mr. Landgraf testified that the maintenance man lived in the carriage house '. . . in exchange for his being available for assistance to Mr. Franklin in event two people were required at night for emergency duty . . .'. In view of Mr. Franklin's role as 'troubleshooter' and the wide range of his duties, it is readily apparent why the hospital has provided living quarters for a maintenance man to assist Mr. Franklin.

"In addition to the aforegoing evidence, it is a fact that none of the residential properties yield any revenue to the Hospital.

. . .

"In the instant appeals, it is manifest that the Hospital has provided the subject living quarters for its benefit and advantage and the total absence of revenue yield from these properties negates any possible claim or argument that they are commercial in character.

". . . The use of the assembled lots for construction purposes and as a parking lot was necessary to carry out the Hospital's charitable purpose. Both on January 1, 1959 and January 1, 1960, the assembled lots were being utilized by the Hospital's contractor in con-

nection with the construction of the Hospital's east wing. . . . This was the sole use of these lots until July, 1960 when the east wing construction was completed. . . .

"On January 1, 1961 and for approximately six months prior thereto, the assembled lots were used '. . . as a parking lot by visitors, hospital personnel including residents and interns'. Mr. Dalton testified that the parking lot could accommodate 'seventy automobiles' and that all hospital employees, residents and interns parked free of charge during this period of time. Visitors were charged for parking not at official rates but on the basis of what could be collected from them by the individual who had been placed in charge of the parking lot. The Hospital did not derive any revenue from this operation of the parking lot.

"The facts as thus found dispel any notion that the parking lot use was a commercial operation. In fact, Mr. Dalton stated: '. . . it did not pay the man to stay there because his parking there was a limited amount of parking for visitors.' In brief, the principal and actual use was free parking for the benefit of hospital personnel. It can hardly be denied at this point in time that 'adequate free parking facilities are certainly as important to a public charity as they are to a business'; Academy of Natural Sciences v. Philadelphia, 6 [Pa.] D. & C. 2d 145 (1955). This is particularly true in a heavily congested traffic area such as that surrounding Allegheny General Hospital. In short, these lots were used necessarily and directly for the purposes of the hospital. The fact that some revenue was received, not by the hospital but by the parking lot 'operator,' in return for which he supervised the lot for the benefit of the hospital personnel and hospital visitors using it for parking does not change its status."

See *Moon Township Appeal,* 387 Pa. 144, 127 A. 2d 361 (1956), wherein the parking area was held exempt although operated by a concessionaire.

Orders affirmed.

WATKINS, and JACOBS, JJ., dissent.