367 Mass. 301                                           301

Board of Assessors of Hamilton v. Iron Rail Fund of Girls Clubs of America, Inc.

BOARD OF ASSESSORS OF HAMILTON vs. IRON RAIL FUND
OF GIRLS CLUBS OF AMERICA, INC.

Suffolk.   January 6, 1975. — April 3, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, HENNESSEY, & WILKINS, JJ.

*Charity.   Taxation,* Real estate tax: exemption, charity.

On an appeal to this court from a decision of the Appellate Tax Board
    granting an abatement of real estate taxes, facts found by the
    board which were not mutually inconsistent, were, under G. L.
    c. 58A, § 13, final.  [302]
A decision of the Appellate Tax Board granting an abatement of the
    real estate tax for 1972 on property of a charitable corporation on
    the ground that the property was used for charitable purposes and
    was thus tax exempt under G. L. c. 59, § 5, Third, was justified
    by warranted findings that the pattern of seasonal use of the
    property for a summer camp for girls during 1971 was the same
    as that of many years previous, that on the assessment date of Jan-
    uary 1, 1972, the corporation intended to conduct the summer
    camp in 1972, and that such use of the property had not been dis-
    continued on January 1, 1972, despite the facts that the corpora-
    tion's directors had voted in 1971 to petition for its dissolution and
    that the corporation was dissolved and the property conveyed to
    another charity in 1972.  [304-308]

APPEAL from a decision of the Appellate Tax Board.
*William Shields, III,* for the Board of Assessors of
Hamilton.
*F. Dale Vincent* (*John A. Whipple* with him) for the
Iron Rail Fund of Girls Clubs of America, Inc.
QUIRICO, J.   This is an appeal by the board of assessors
of the town of Hamilton (assessors) from the decision of
the Appellate Tax Board (board) granting an abatement
of 1972 real estate taxes on two parcels of land to the
Iron Rail Fund of Girls Clubs of America, Inc. (Iron
Rail).   The assessors valued Iron Rail's Hamilton real

estate at $159,980 and assessed a tax thereon in the amount of $6,239.22. On October 1, 1972, Iron Rail filed applications for abatement of this tax on the ground that it was a charitable organization exempted from such taxes by G. L. c. 59, § 5, Third.[1] On October 27, 1972, the assessors denied these applications. Iron Rail paid the tax on December 12, 1972, and appealed the decision of the assessors to the board under G. L. c. 58A, § 7. The board, acting under § 13, held "that on January 1, 1972, the Iron Rail property in Hamilton was owned and operated by the appellant for the purpose for which it was incorporated and that the said property was exempt from taxation for the year 1972." The assessors claimed an appeal to this court. G. L. c. 58A, § 13. The evidence was reported.

Under G. L. c. 58A, § 13, the decision of the board is final as to findings of fact, at least where those findings are not mutually inconsistent. The board's ultimate conclusions are upheld whenever they are warranted by the evidence. *Assessors of Boston* v. *Garland Sch. of Home Making,* 296 Mass. 378, 383 (1937). *Brockton Knights of Columbus Bldg. Assn. Inc.* v. *Assessors of Brockton,* 321 Mass. 110, 113 (1947). *Assessors of Worcester* v. *Knights of Columbus Religious Educ. Charitable & Benevolent Assn. of Worcester,* 329 Mass. 532, 535 (1952). *Assessors of Everett* v. *Albert N. Parlin House, Inc.* 331 Mass. 359, 364 (1954). *Children's Hosp. Medical Center* v. *Assessors of Boston,* 353 Mass. 35, 39-40 (1967). *Schlaiker* v. *Assessors of Great Barrington,* 365 Mass. 243, 245, and fn. 2 (1974). We believe the board's findings are not inconsistent and that the evidence before the board war-

---

[1] General Laws c. 59, § 5, Third, as appearing in St. 1957, c. 500, § 1, so far as applicable to the present case, provides a tax exemption for "real estate owned by or held in trust for a charitable organization and occupied by it or its officers for the purposes for which it is organized or by another charitable organization or organizations or its or their officers for the purposes of such other charitable organization or organizations."

ranted the granting of the abatement. We summarize the board's findings.

Iron Rail was a Massachusetts corporation organized on April 23, 1954, under the provisions of G. L. c. 180. It was a subsidiary of Girls Clubs of America, Inc. (Girls Clubs). As set forth in its charter and its articles of organization, Iron Rail was formed "[t]o maintain and operate one or more camps or vacation homes for girls and women and their children," and to conduct activities incident thereto. Later in 1954, Iron Rail acquired 296 acres of land, including a lake and various buildings, in the towns of Hamilton, Essex and Wenham.[2] Each summer thereafter, through 1970, Iron Rail operated a summer camp for girls on the property. A minimal charge, insufficient to make the camp self-sustaining, was paid for each camper; the camp therefore depended heavily on contributions. Orientation and staff training and special events for girls were also held at the camp periodically throughout the year.

Early in 1971, however, Iron Rail suffered considerable misfortune, including the incapacitation of its top administrators, a fire in the camp's main building, and the loss of the backing of the camp's principal financial supporter. The cumulative impact of these blows caused Iron Rail to curtail, but not eliminate its 1971 camping program. At the end of the 1971 summer session, the buildings were closed and the furniture stored, in accordance with the procedures followed in previous summers. The salaried maintenance superintendent and two non-salaried maintenance employees stayed on and lived rent free in homes on the Iron Rail property in Hamilton. The duties of these three men included maintaining and

---

[2] While this appeal involves only the Hamilton property, nothing in the record suggests any distinction of import in the uses of the property in the three towns. In other words, the property appears to have been treated as a unit by the parties to this case and by the board in so far as the use thereof is concerned. Our discussion above generally continues this treatment.

patrolling the property. On the basis of the foregoing subsidiary findings, the board found "that there was no deviation or change in the use of the camp property in the fall and winter of 1971 from that of previous years."

On September 21, 1971, the Iron Rail board of directors met to discuss the future of Iron Rail. An appraisal of the Iron Rail property was obtained, and the maintenance superintendent was instructed to restore the fire damaged building without making any structural changes. At this meeting the directors voted to petition this court for dissolution in accordance with G. L. c. 180, § 11A, and to convey the Iron Rail assets to Girls Clubs. It was further voted that the president of Girls Clubs be requested to appoint a long range planning committee for the use of the proceeds to be received from the sale of Iron Rail properties. This committee was also intended to determine whether Iron Rail should continue the same type of camping program if the funds to finance these programs should become available. These matters were discussed at numerous other meetings and conferences during the fall and winter of 1971. The board found that "the vote of September 21, 1971, of the board of directors . . . to dissolve the corporation was not final or irreversible when viewed in light of the other action that the committee took, especially in considering the advisability of continuing the operation of the girls camp if the funds became available. . . . The board feels that on January 1, 1972, the appellant could have and probably would have continued to operate the Iron Rail property as a summer camp for girls if the necessary funds were available." On the basis of all of its findings, the board concluded that as of the assessment date, January 1, 1972, the use of the subject property as a camp or vacation home had not been discontinued.

The assessors do not dispute the proposition that as long as Iron Rail carried on its camping program for girls on the property in question, it was exempt from taxation. "Where there is some relief of poverty, assistance or

benefit to the less privileged, promotion of the health or the general welfare of a group, or other similar special advancement of deserving persons, gifts for the assistance of a described indefinite class have been said to be charitable, even where the benefits may have been in part recreation." *Staman* v. *Assessors of Chatham,* 351 Mass. 479, 484 (1966). Neither do they challenge the board's finding that as of January 1, 1972, the Iron Rail property was being used, or unused, in the same manner as in prior years. Concomitantly, the assessors do not contest the board's finding that, at least through 1971, the seasonal pattern of use of the Iron Rail property had not been broken.

Without citation, however, the assessors state: "In cases of seasonal use the question of exemption necessarily goes beyond mere physical appearance on the assessment date and depends upon the events and decisions which show the status of the operation which may or may not produce subsequent occupancy in that year." In line with this statement, the assessors ask us to look at a number of events which occurred in 1972. These events include: (a) Iron Rail's filing of a petition for dissolution with this court in February, 1972; (b) its listing of its property for sale in July, 1972; (c) its conveyance of all its assets to Girls Clubs, also in July, 1972; (d) its dissolution by order of this court in August, 1972; and (e) its failure to operate a camp at all in 1972. As the assessors put it: "[T]he Board relies on findings that Girls Clubs, the intended donee, was exploring camping as a use for the property, that the vote of the Iron Rail to dissolve was not irreversible, and that camping operations might have continued if the necessary funds were available. . . . In fact, the property was never used for camping again; the decision to dissolve, characterized as 'not irreversible' was not reversed; the funds that might have been available never materialized."

There is some appeal to the argument that surrounding events and decisions should be examined with special care

to clarify the true circumstances of the use of property when that use is seasonal in nature. Nevertheless, with exceptions not here applicable, in this Commonwealth January 1 of each year is the assessment date. G. L. c. 59, § 21. The rule which flows from this is settled: "It is the use of the property at the time when the tax is assessed which determines whether it is exempt from taxation or not." *Trustees of Amherst College* v. *Assessors of Amherst,* 193 Mass. 168, 178 (1906). The exemption provided in G. L. c. 59, § 5, Third, is available, therefore, if a charitable organization owns real estate and occupies it for its corporate purpose, or allows another charitable organization to occupy it for its purpose, on January 1. *Animal Rescue League of Boston* v. *Assessors of Bourne,* 310 Mass. 330, 332 (1941). *Milton Hosp. & Convalescent Home* v. *Assessors of Milton,* 360 Mass. 63, 67 (1971). Even granting that, where seasonal use is involved, it is necessary to consider intentions for the future use of property, it still does not follow, as the assessors seemingly contend, that a later course of events conclusively proves what intentions existed in the past. In other words, as applied to this case, Iron Rail's intentions as of January 1, 1972, may have been relevant in determining the nature of its use of its property as of that date, but the fact that Iron Rail did not operate a summer camp in 1972 does not prove it never intended to do so. We accordingly reject the assessors' apparent contention that the 1972 events demonstrate that the board erred in its finding in regard to Iron Rail's intentions as of January 1, 1972. The evidence before the board, which we have carefully examined, amply warranted the finding that as of January 1, 1972, Iron Rail intended to conduct a summer camp in 1972.

The assessors further attempt, however, to characterize Iron Rail's evidence of its use of its property as equivocal, and to urge us to hold that this equivocal evidence

cannot justify a tax exemption. The principal support for this argument is *Redemptorist Fathers* v. *Boston,* 129 Mass. 178, 182 (1880), where, according to a passage in the assessors' brief, this court, "casting aside evidence of intended or hypothetical use, required that the 'actual appropriation of the land to the purposes for which the . . . [charitable organization] was incorporated *must be unequivocally shown* . . .' ([e]mphasis added)." This reliance on the *Redemptorist Fathers* case is misguided. There the charitable organization sought an exemption for a parcel of land which had never been used for charitable purposes, although it was located across a private way from another parcel which had been so used. The exemption was denied because the charitable organization was not occupying the land for charitable purposes on the assessment date; an intention to use it for such purposes later in the year was considered inadequate to justify an exemption.

The circumstances of the *Redemptorist Fathers* case are obviously not present here. For one thing, Iron Rail had established a pattern of seasonal use which, at least in past years, entitled it to the exemption. While the burden is on the taxpayer to establish his right to an exemption, *Redemptorist Fathers, supra,* at 180, plain common sense suggests to us that even somewhat equivocal expressions of an intention to occupy property for a charitable purpose are entitled to more weight in the case of an organization which has so occupied the property annually for many years than they are in the case of an organization which has never so occupied the property. Moreover, since G. L. c. 59, § 5, Third, provides an exemption when property owned by one charitable organization is occupied by another for its charitable purposes, even if the board had found that Iron Rail's decision to dissolve and convey its assets to Girls Clubs was irreversible, we think the granting of the abatement could still have been justified in all the circumstances of this case. We thus believe the board was warranted in

finding that as of January 1, 1972, despite any equivocation as to its intentions, Iron Rail was occupying the property in question for its charitable purpose.

The assessors' final argument seems to revolve around the claim that "if any dominant intention may be derived from the evidence, that intention was that the property was to be sold." See *Emerson* v. *Trustees of Milton Academy*, 185 Mass. 414, 415 (1904). This claim, however, directly controverts the board's finding, which we have held was warranted, that on January 1, 1972, subject only to the availability of funds, "the appellant could have and probably would have continued to operate the Iron Rail property as a summer camp for girls." As we stated early in this opinion, such findings are final by virtue of G. L. c. 58A, § 13.

The decision appealed from is affirmed. The appellee is to have costs of appeal.

*So ordered.*