TRUSTEES OF BOSTON UNIVERSITY *vs.* BOARD OF
ASSESSORS OF BROOKLINE.

Suffolk.  December 12, 1980. — February 9, 1981.

Present: ARMSTRONG, GREANEY, & KASS, JJ.

*Taxation,* Real estate tax: exemption, educational institution. *Statute,*
Construction, Retroactive statute. *Words,* "Part of," "Contiguous."

In a proceeding before the Appellate Tax Board, evidence that the resi-
dence of the president of Boston University was one-third of a mile
away from the area containing most of the real estate owned and occu-
pied by the university and was separated from that area by a maze of
streets and several parcels of privately owned property warranted a
finding that the residence was not "part of" or "contiguous to" the uni-
versity's "principal location" and the residence was, therefore, not en-
titled to exemption from taxation under G. L. c. 59, § 5, Third (*e*), as
amended by St. 1974, c. 811, § 2. [327-331]
Statute 1974, c. 811, § 3, which made retroactive for the fiscal year in
which the statute became effective a provision removing a tax exemp-
tion for residences of officers of an educational institution if the resi-
dences were not part of or contiguous to the institution's principal lo-
cation was not unconstitutional. [332]

APPEAL from a decision of the Appellate Tax Board.

After review was sought in the Supreme Judicial Court,
the case was transferred to the Appeals Court.

*Evan·Y. Semerjian* (*Kenneth R. Berman* with him) for
the plaintiff.

*Casimir deRham, Jr.* (*Francis E. Ackerman* with him) for
the defendant.

GREANEY, J.  This case concerns the status of Boston Uni-
versity's real estate tax exemption for the home presently oc-
cupied by its president at 132 Carlton Street in Brookline.
In 1974, the Legislature amended G. L. c. 59, § 5,
Third(*e*), by St. 1974, c. 811, § 2, to deny tax-exempt status

to property owned by a qualifying educational institution and occupied or used as a residence for its officers unless the property "is . . . part of or contiguous to real estate which is the principal location of such institution."[1]  The act was expressly made applicable to taxes due in 1975.  Based on the amendment, the Brookline assessors valued the property, assessed taxes thereon to the University's trustees for the years 1975, 1976 and 1977, and denied the trustees' applications for a statutory exemption in each of the three years.  The Appellate Tax Board (board) heard appeals (under G. L. c. 58A, § 7), from the assessors' decisions on a statement of agreed facts and exhibits.[2]  The board determined that the "Massachusetts Turnpike Extension (a public way) separates the locus from most of the real estate which is owned and occupied by [the University] for its charitable and educational purposes," and that the University's "[r]eal estate . . . located north of the Massachusetts Turnpike Extension and Commonwealth Avenue constitutes the [University's] principal location."  The board also found that the Carlton Street property was separated from this location "by an intervening parcel of real estate owned by the Massachusetts Turnpike Authority," and that, as a result, it was neither "part of" nor "contiguous to" the main campus within the meaning of the statutory exemption.  On this appeal, the University argues that the board incorrectly de-

---

[1] The full text of St. 1974, c. 811, § 2, reads as follows: "Real and personal property of an educational institution coming within the foregoing description of a charitable organization which is occupied or used wholly or principally as residences for officers of such institutions and which is not part of or contiguous to real estate which is the principal location of such institution shall not be exempt."

[2] The stipulated facts dealt principally with the University's status as a charitable and educational institution, the assessed value of the property and the amount of the tax bills, and the various dates on which the taxes were paid and on which the procedural steps to abate the taxes were taken.  As might be expected, the agreed exhibits consisted of a map of the University's Charles River campus and vicinity, which indicated the parcels owned by the University in Brookline and Boston, and a campus map which identified the nature of the facilities located on each parcel.

fined and applied the pertinent concepts in the statute, and that the Legislature could not constitutionally enact a provision which retroactively removed the exemption for fiscal 1975. We hold that the board's decision was correct and that the statute's limited retroactivity was proper.

1. *Merits of the Exemption.*

(a) *The University's "principal location."* The proper starting point for the board's analysis was a determination of the University's principal location. The Legislature left that term undefined in the statute, undoubtedly because of the practical difficulties inherent in fashioning a definition which could be uniformly applied to the Commonwealth's numerous educational institutions, several of which, like Boston University, are dispersed throughout large urban areas. We believe that ascertainment of the University's principal location involved essentially a question of fact and that it was intended that the board have a measure of discretion in resolving the question.

The record before the board revealed that the University's Charles River campus is comprised of approximately 121 parcels of property spread throughout Boston and Brookline. Many of these parcels do not abut other University property and the entire campus is intersected by public ways. Seventy-nine parcels (roughly sixty-five per cent of the total) are clustered north of both the Massachusetts Turnpike Extension and Commonwealth Avenue. This group includes the majority of the University's schools and colleges, its administrative and admissions offices, a number of student residence halls and faculty residences, the George Sherman University Union, the Mugar Library, and many other facilities. That board's determination that the core of the University was located in the unified area north of the Massachusetts Turnpike Extension and Commonwealth Avenue, which encompassed the aforedescribed facilities, cannot be said to be unreasonable, arbitrary, or inconsistent with the agreed facts.[3] The board's findings of fact are "fi-

_____

[3] It appears, although the decision does not expressly so state, that the board considered the Boston University bridge to be the westerly bound-

nal . . . at least where those findings are not mutually inconsistent." *Assessors of Hamilton* v. *Iron Rail Fund of Girls Clubs of America, Inc.,* 367 Mass. 301, 302 (1975), and cases cited. G. L. c. 58A, § 13. Since that aspect of the decision is not erroneous under the relevant standard of review, the University's contention that the area should have included other facilities in the vicinity of the main campus was properly rejected by the board.

(b) *Definition of "part of" or "contiguous to."* Once the University's principal location was fixed, the board was required to ascertain whether the Carlton Street property was a "part of" or "contiguous to" that location. This necessitated interpretation of each of these terms, and application of the interpretations, once arrived at, to the agreed facts. The board determined that "[t]he usual and ordinary meaning of the words 'part of' . . . is a portion, division or segment of a whole[,] . . . whole mean[ing] that which is not divided or disjoined."[4] It defined "contiguous" as "import[ing] 'actual contact, something that adjoins' . . . or 'touching along boundaries.'"[5] It then held that the intervening parcel of real estate owned by the Turnpike Authority between the locus and the main campus defeated the University's entitlement to the exemption.

The board's interpretation of these terms was properly guided by the settled principle that "'a statute must be interpreted according to the intent of the Legislature ascer-

ary and either Sherborn or Deerfield Street to be the easterly boundary of the principal location. Even if the board had held that the University's principal location was bounded by Commonwealth Avenue to the southwest and the turnpike extension to the southeast (instead of vice-versa) — thus including an additional twenty-nine per cent (approximately) of the University-owned parcels in the vicinity of the main campus — our ultimate result would remain the same because of the separation of the locus from the main campus by intervening property.

[4] Citing The American Heritage Dictionary 955, 1463 (New College ed. 1976).

[5] Citing Webster's New Intl. Dictionary 492 (3d ed. 1966); *Chugach Elec. Assn.* v. *Anchorage,* 214 F.2d 110, 112 (9th Cir. 1954); and *Lamson* v. *Secretary of the Commonwealth,* 341 Mass. 264, 275 (1960).

tained from all its words by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.'" *Industrial Fin. Corp.* v. *State Tax Commn.*, 367 Mass. 360, 364 (1975), quoting from *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934). See *Prudential Ins. Co. of America* v. *Boston*, 369 Mass. 542, 546 (1976), and cases cited. The creation or elimination of exemptions from the real property tax involves questions of policy. In enacting c. 811, the Legislature obviously intended to implement a policy which would restrict the availability of tax exemptions for officers' residences owned by educational institutions, thereby bringing more of these properties onto the municipal tax rolls.[6] The provisions of the statute set out a convenient bright-line test suited to the accomplishment of these aims; previous standards keyed to the premises' use and relationship to the institution's programs were abandoned. See generally Annot., Educational Tax Exemption — Living Quarters, 55 A.L.R. 3d 485, 516-525 (1974). The board acted properly in adopting accepted lexical definitions of the statute's key terms in furtherance of readily perceived legislative goals. See G. L. c. 4, § 6, In General and Third; *Moy* v. *Jack Madden Ford Sales, Inc.*, 4 Mass. App. Ct. 102, 105 (1976); *Andover Consultants, Inc.* v. *Lawrence*, 10 Mass. App. Ct. 156, 158 n.4 (1980). Cf. *Commonwealth* v. *W. Barrington Co.*, 5 Mass. App. Ct. 416, 418-419 (1977). The board was not required to adopt the University's requests for more sweeping definitions which would have exempted the property as long as it was "near" the main campus or part of it in a func-

---

[6] This policy was expressed in the act's title as "removing the exemption from real estate taxes of residences occupied by officers of educational institutions when such residences are not on the campuses of such institutions." "The title of an act is to be considered in construing the act." *Silverman* v. *Wedge*, 339 Mass. 244, 245 (1959). See *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 352-353 (1973).

tional sense.[7] If these interpretations had been accepted, they would have effectively nullified the dominant objectives of the legislation.

(c) *Application of those definitions to the locus.* We were concerned at argument that the board's decision might be given an impractical reading and construed as holding that separation of an officer's residence from the main campus only by a public way (even a large public way such as the turnpike) would defeat an otherwise valid claim of exemption. It cannot escape our attention, however, that the agreed exhibits show the Carlton Street property to be about one-third of a mile away from the nearest parcel in the cluster constituting the University's principal location. To reach the main campus from the president's home one must cross Lenox Street and traverse the Carlton Street bridge which overpasses a private railroad, the turnpike extension and the Massachusetts Bay Transportation Authority's trolley tracks. This intervening one-third mile can be viewed as a rectangle which is bordered on the north by Commonwealth Avenue, on the south by Lenox Street, on the east by St. Mary's Street, and on the west by Essex Street. In addition to the streets and railways named above, the rectangle also contains several other privately owned parcels of land located on Lenox Street and Commonwealth Avenue which separate the locus from the main campus. "The board's ultimate conclusions are [to be] upheld whenever they are warranted by the evidence."

---

[7] The University has argued that a building is "part of" an educational institution's real estate if it is "among" the buildings that constitute that real estate. It urges that the building "need not be physically connected to [the other real estate], just as a stamp is part of a stamp collection even though not physically connected to the other stamps, and a violinist is part of an orchestra even though seated separately from the other musicians." We think that the Legislature intended that the terms be interpreted in a geographical sense, not in a philatelic or orchestral sense. The board also properly rejected the cases from other jurisdictions cited by the University which construed similar exemptions in a more liberal sense based on a statutory framework and policy which differ from the goals embodied in G. L. c. 59, § 5, Third(*e*).

*Assessors of Hamilton* v. *Iron Rail Fund of Girls Club of America, Inc.*, 367 Mass. at 302, and cases cited. This intervening maze of streets and real estate obviates our initial concern and supports the board's ultimate conclusion regardless of its reliance on the Turnpike Authority's property. Cf. *Assessors of Boston* v. *Boston, Revere Beach & Lynn R.R.*, 319 Mass. 378, 379 (1946); *Treasurer of the County of Norfolk* v. *County Commrs. of Norfolk*, 7 Mass. App. Ct. 368, 374-375 (1979).

(*d*) *The law governing exemptions.* We also consider the board's decision to be consistent with settled principles applicable to the grant of exemptions. They have generally been viewed with a "hostile eye," *Oklahoma Tax Commn.* v. *United States*, 319 U.S. 598, 612 (1943) (Murphy, J., dissenting in part), — as matters of special favor or grace — to be recognized only where the property falls "clearly and unequivocally . . . within the terms of the exemption." *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston*, 294 Mass. 248, 257 (1936), and cases cited. The "burden of proving an exemption is upon the taxpayer who claims it," *Boston Chamber of Commerce* v. *Assessors of Boston*, 315 Mass. 712, 716 (1944), and the proof must be such as "'leaves the question free from doubt.'" 3 Sands, Sutherland Statutory Construction § 66.09, at 207 (4th ed. 1973). Any special consideration that was formerly given to charitable and educational institutions by a liberal construction of exemption policies (see *Trustees of Phillips Academy* v. *Andover*, 175 Mass. 118, 125 [1900]) "has not survived in the many subsequent judicial decisions which have shown a concern for the increasing proportion of our real estate enjoying exemption from taxation with the corresponding increase in the burden being imposed on the shrinking proportion which is taxable." *Milton Hosp. & Convalescent Home* v. *Assessors of Milton*, 360 Mass. 63, 66 (1971). The University's approach to the case, while imaginative does not satisfy the burden imposed by these cases on the taxpayer. *Boston Chamber of Commerce* v. *Assessors of Boston, supra* at 716, and cases cited.

2. *Retroactivity.* The statute was enacted without an emergency preamble on August 12, 1974, and provided in § 3 thereof that it would "apply to taxes levied for fiscal years ending on June [30, 1975], and thereafter." The University argues that the taxability of the property for 1975 was determined under G. L. c. 59, § 21,[8] on January 1, 1974, and that the provision for retroactivity contained in c. 811 impermissibly nullified its vested rights to an exemption for fiscal 1975.

Tax statutes may be made retroactive if the Legislature so intends. *Magee* v. *Commissioner of Corps. & Taxn.,* 256 Mass. 512, 517 (1926). A tax statute having retroactive effect will be sustained against constitutional attack unless "the retroactive feature . . . is arbitrary and burdensome." 2 Sands, Sutherland Statutory Construction § 41.10, at 286 (4th ed. 1973). There is no doubt here that the Legislature intended that the statute apply to fiscal 1975. The retroactive provision is uniform in its application to all properties which fail to qualify for the exemption. The change was made by the Legislature before the taxes for 1975 were due and the amount of tax paid by the University for that year was not large. We are not persuaded that the University had acquired any "vested right" to the exemption. We hold on the reasoning and authority stated in the recent decision of *Keniston* v. *Assessors of Boston,* 380 Mass. 888, 905 (1980), that the limited measure of retroactivity imposed by c. 811 is not oppressive in a constitutional sense and that this "retroactive adjustment in taxes for the year in which [the] statute became effective is a reasonable exercise of legislative power."

*Decision affirmed.*

---

[8] This statute provides that taxes on real estate "shall be assessed as of January first preceding the fiscal year with respect to which the taxes are assessed."